GLADYS MILLER, PLAINTIFF-RESPONDENT, v. JAY MILLER, DEFENDANT-APPELLANT.

Argued January 24, 1984—Decided July 19, 1984.

jury. The jury and the jury alone makes this finding." [*State v. Laws, supra,* 51 *N.J.* at 553 (Francis, J., dissenting).]

156

158

*Vincent L. Stripto* argued the cause for appellant (*Drazin & Warshaw,* attorneys).

*David Noah Dubrow* argued the cause for respondent (*Stern, Dubrow, Marcus & Cooper,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

Today we must decide whether a stepparent can be equitably estopped from denying the duty to provide child support for minor stepchildren after divorcing their natural parent. If equitable estoppel does apply to stepparents' situation, we must also decide what evidence must be presented to establish a cause of action for child support.

Gladys Miller married Jay Miller on December 16, 1972. No children were born of their marriage. During the couple's marriage Gladys' two daughters by her prior marriage lived with the Millers. Gladys and Jay separated on December 12, 1979. In February, 1980, Gladys filed a Verified Complaint seeking dissolution of the Millers' marriage. Although Jay was not the natural or adoptive father of Gladys' daughters, Gladys sought child support from Jay for her children. In her complaint, she alleged that by his actions, Jay had induced the girls to rely on him as their natural father, to their emotional and

financial detriment.  By so doing, he had prevented and cut off the girls' relationship with their natural father.  Therefore, she claimed he was equitably estopped from denying a duty to pay child support.  Jay claimed that although he stood *in loco parentis* to the children during his marriage, he was merely their stepfather and any legal relationship he had with the children terminated with his divorce from their mother.

The trial court agreed with Gladys.  It held that Jay was equitably estopped from denying his duty to support the girls, and required him to pay child support of $75 per week per child. The trial court based its holding primarily on the concept of "emotional bonding."  Jay, by his actions, had knowingly and intentionally fostered a *bona fide* parental relationship with the girls, so that in their minds he became their father.  Therefore, he could not avoid the financial obligations flowing from that relationship.

The Appellate Division affirmed the trial court's judgment, primarily because it found that Jay had actively interfered with the normal relationship between the girls and their natural father to the girls' emotional and financial detriment.  We granted certification, 94 *N.J.* 614 (1983).

We conclude that in appropriate cases *pendente lite* and permanent support obligations may be imposed on a stepparent on the basis of equitable estoppel.  In this case, we hold that the facts established at trial are sufficient to impose a *pendente lite* award but are not sufficient to indicate whether a permanent support obligation should be imposed.  We therefore reverse and remand this case to the trial court for further findings of fact and a determination consistent with this opinion.

I

Prior to her marriage to Jay, Gladys was married to Ralph Febre.  Two children were born of that marriage: Michelle, born July, 1963, and Suzette, born July, 1966.  Shortly after Suzette's birth in 1966, Gladys separated from · Ralph;  she divorced him in 1969.

The essential facts concerning Ralph's support of his children are undisputed. Although there was no support provision in the divorce agreement, Ralph continued to support Gladys and the children after the couple's separation until he went to prison on a narcotics charge in 1968. Immediately before going to prison, Ralph gave Gladys $5,000 for the support of his daughters. While he was in prison and after he was released, he continued to express his concern for his children.

Gladys married Jay while Ralph was in prison. After his release, Ralph told Gladys that he wanted to support his daughters. However, when he did send a check to the girls, Jay tore it up. Jay testified that he refused Ralph's money because he was concerned that he and Gladys "would be tied to his illegal activities," presumably meaning Ralph's narcotics activities. Faced with Jay's opposition, Ralph eventually stopped attempting to send money to the children. Thus, during the period of his marriage to Gladys, Jay supported the children and even claimed them as dependents on his 1979 tax return, which he filed after he separated from their mother. During all this time, Ralph did not support the children.

It is also undisputed that throughout the seven years that Jay and Gladys lived together, Jay developed a loving relationship with the two girls. The children came to refer to him as "daddy" and to his mother and father as "grandma" and "grandpa." As the Appellate Division found,

> he was an affectionate father and took the girls everywhere. He held the girls out as his own children. He even became a Girl Scout Troop leader, so he could be with them. He enjoyed sports with them and they came to love defendant as a father.

At the trial both children testified separately *in camera* that they knew Ralph was their natural father, but that they considered Jay their "father" and loved him very much.

Although the Millers discussed the possibility of Jay's adopting the girls, Ralph refused to consent to the adoption. Therefore, the girls' names could not be changed legally to Miller. Nevertheless, although it is disputed who initiated the change,

it is uncontroverted that during the time the girls lived with Jay, they began using the surname Miller at school, and their school records were changed to reflect that their name was Miller. At the time of the Millers' divorce, in contrast, Michelle, a student at the University of South Florida, was registered under the name of Febre, which she also used on her driving license. Since the divorce, both girls have been using the surname Febre.

The Millers disagree as to the extent of the children's contact with their father over the years. Gladys testified that she took the children to visit Ralph once while he was in prison and that he visited the children once at their maternal grandmother's house. This latter visit provoked such opposition from Jay that although Ralph often sought to see the girls thereafter, their mother did not allow them to have any further meetings with him until the summer of 1979. At that time, she realized that her marriage to Jay was over, and she allowed the girls to visit their father in California for six weeks. Jay disputed this testimony; he claimed that the children visited their father several times while he was in prison, and upon his release they had regular contact with him, seeing him during the summers and over Christmas holidays, as well as speaking to him over the telephone and receiving letters from him.

The Appellate Division found from the testimony, and for the purpose of this appeal we find, that

upon Ralph's release from jail he attempted to visit his children but defendant [Jay] strenuously opposed any visitation and, in fact, prohibited it. He rejected all offers of Ralph to contribute to the support of his children and tore up a check tendered for that purpose. Ralph desisted from further attempts at visitation or payment of support.

## II

Jay contends that the loving relationship he developed with the girls was not sufficient to impose a financial obligation on him to continue to support the girls after his separation from their mother. He claims that upon the termination of his

marriage to their mother, his financial obligation to the girls ceased.

New Jersey has no statutory requirement imposing a duty of support on a stepparent for his or her spouse's children by a former marriage. Nor did the common law impose a legal obligation on a stepparent to support the children of his or her spouse by another party. Such an obligation arises by a voluntary assumption on the part of the stepparent to support the children. This *in loco parentis* relationship exists when a stepparent receives a child into the family home under circumstances giving rise to a presumption that he or she will assume responsibility to maintain, rear, and educate the child. *A.S. v. B.S.*, 139 *N.J.Super.* 366, 369 (Ch.Div.1976), aff'd, 150 *N.J.Super.* 122 (App.Div.1977). The relationship, however,

> exists only so long as the parties thereto, namely the surrogate parent and/or the child, desire that it exist. In that regard, the *in loco parentis* status differs from natural parenthood or adoption. The latter two permanently affix rights and duties, while the former affixed rights and duties temporary in nature. *Schneider v. Schneider*, 25 *N.J.Misc.* 180, 52 *A.2d* 564 (Ch.1947); *D. v. D.*, 56 *N.J.Super.* 357 (App.Div.1959). [*Id.* at 369–70.]

Thus, in most cases, when a stepparent who stands *in loco parentis* to a stepchild divorces that child's natural parent, the *in loco parentis* relationship is deemed terminated and any obligation of support the stepparent has assumed terminates. *See* 59 *Am.Jur.*2d "Parent and Child" § 91 at 190 (1971); *see also Amadeo v. Amadeo*, 64 *N.J.Super.* 417, 425 (App.Div.1960) (until stepfather disclaims *in loco parentis* status, he is responsible for child support of stepchild); *D. v. D.*, 56 *N.J.Super.* 357, 361–62 (App.Div.1959) (*in loco parentis* relationship lies within will of stepfather).

### III

Despite the general rule that an *in loco parentis* relationship terminates upon the intent of the stepparent, courts in certain cases have held that a stepparent's duty to support a spouse's children extends beyond the dissolution of their marriage. In

most of these cases the courts have relied on principles of equitable estoppel or implied contract to impose a continuing obligation of child support on a stepparent after he or she divorces the children's natural parent.

The burden of proof of a claim based on principles of equitable estoppel is clearly on the party asserting estoppel. *Virginia Constr. Corp. v. Fairman*, 39 *N.J.* 61, 72 (1962); *see also Lawes v. Lynch*, 7 *N.J.Super.* 584, 593 (Ch.Div.), aff'd, 6 *N.J.* 1, 11 (1950) (estoppel must be proved by the party who asserts it). To establish a claim of equitable estoppel, the claiming party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment. *Fidelity Union Trust Co. v. Essex Cty. Mortgage Co.*, 130 *N.J.Eq.* 351, 353 (E. & A.1941); *see Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 *N.J.* 334, 339 (1979); *Clark v. Judge*, 84 *N.J.Super.* 35, 54 (Ch.Div.1964), aff'd, 44 *N.J.* 550 (1965); *Feldman v. Urban Commercial, Inc.*, 70 *N.J.Super.* 463, 474 (Ch.Div.1961); *Lawes v. Lynch, supra*, 7 *N.J.Super.* at 593.

Two New Jersey courts have invoked the principle of equitable estoppel to enforce a continuing duty of support. *A.S. v. B.S., supra*, 139 *N.J.Super.* 366, aff'd, 150 *N.J.Super.* 122; *Ross v. Ross*, 126 *N.J.Super.* 394 (J. & D.R.Ct.1973), aff'd, 135 *N.J.Super.* 35 (App.Div.1975).

In *Ross, supra*, the husband married the child's mother eighteen months after the birth of her child. After the marriage, the parties and the child lived together for four years, during which time the husband filed a certification of admission of paternity with the Bureau of Vital Statistics and treated the child as his own. During the support hearing, it became clear that the child, then seven years old, believed that the husband was his natural father. The court rejected the husband's

argument that he was not obligated to support the child. In applying the doctrine of equitable estoppel to prevent the husband from denying his paternity, the court looked to cases in which the child would be illegitimized by the husband's denial of paternity and found *Ross* to be such a case. Within this context, the court found that:

> (1) the child sincerely believes that defendant-husband is his father; (2) defendant-husband did by his conduct represent himself to the child as his father, and (3) the mother and her husband are estopped to deny that they are the parents of this child. [126 *N.J.Super.* at 400.]

To find otherwise, the court held, would do irreparable harm and inflict deep injury on the child, the true party in interest.

In *A.S. v. B.S., supra,* 139 *N.J.Super.* 366, aff'd, 150 *N.J.Super.* 122, the child involved was delivered to the parties, a husband and wife, by his natural parents when he was one month old. The natural parents executed a document entitled "Power of Attorney-Consent," but the parties did not officially adopt the child. The parties separated nine years later. In a proceeding by the wife against the husband for support of this child, all the facts were stipulated. The child bore the parties' surname and was registered in school under that name, and the natural parents had neither contributed to the child's support nor attempted to communicate with the child.

The court found that the husband was estopped from denying his duty to support the child. To hold otherwise would do irreparable harm to the child, for as in this case,

> he [the child] is the real party in interest in this proceeding. To permit defendant to repudiate his intent to support the child and no longer stand *in loco parentis* to him would cause irreparable harm to the boy. He would be without familial roots, without a known heritage. Equitable estoppel must be applied in this instance to prevent that result. [*Id.* at 371–72.]

In its holding, the court took care to distinguish the typical "stepfather" case, where the child has one natural parent, from the case before it, where the child had no natural parents.

> The cases cited may be designated generally as "stepfather" cases wherein the child commenced residing in the home of the stepfather upon the latter's marriage to the child's mother. During the course of that marital relationship the stepfather intended to and did support his wife and her child of a prior

marriage. However, upon a dissolution of that familial unit the stepfather's intent to support the child ended. The child then depends solely on its mother, the natural parent, who is obligated to provide for the child. See 11 *N.J. Practice* (Herr Marriage, Divorce and Separation) (3d ed. Lodge), § 981, at 283, and cases therein cited. After the severance of that marriage the relationship between the child and his or her natural mother is no different from what it was before that marriage. [*Id.* at 370.]

Other courts throughout the country have also applied the doctrine of equitable estoppel to extend a stepparent's duty to support his or her spouse's children beyond dissolution of their marriage. In almost all of these cases, the facts were substantially similar to the facts in one of the two prior New Jersey cases, *Ross, supra,* 126 *N.J.Super.* 394, aff'd, 135 *N.J.Super.* 35 and *A.S. v. B.S., supra,* 139 *N.J.Super.* 366, aff'd, 150 *N.J.Super.* 122.

Several rationales for these decisions are advanced. In cases such as *Ross, supra,* in which the husband marries a woman who is either pregnant by another man or has recently given birth to another man's child and the husband thereafter represents himself to both the child and the community as the natural father, equitable estoppel is often applied because of the general policy against allowing parents to testify to the illegitimacy of children whom they have previously treated as their own. This policy was explained in *Clevenger v. Clevenger,* 189 *Cal.App.*2d 658, 11 *Cal.Rptr.* 707, 710 (Dist.Ct.App. 1961),[1] in which it was said:

There is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm. The weapon should garner no profit to the wielder; the putative father should earn no premium by the assertion of the illegitimacy of the child. If any legal hypothesis can prevent such an inducement to publication of illegitimacy, we should adopt that theory.

---

[1] In *Clevenger* the court found no evidence that the stepfather ever represented himself to the child as his natural parent, and therefore held that the stepfather was not equitably estopped to deny his duty to support his stepson.

See also *Hall v. Rosen,* 50 *Ohio St.*2d 135, 363 *N.E.*2d 725 (1977) (Ohio law has irrebutable presumption that when a man marries a woman he knows is pregnant with another man's child, the child, when born, is the legitimate offspring of the marriage).

In cases such as *A.S. v. B.S., supra,* 139 *N.J.Super.* 366, aff'd 150 *N.J.Super.* 122, in which the child never knows its natural parents, the courts reason that the child has no place to turn if its new parents decide that they no longer wish to support it. Children in these situations have relied to their detriment, since they have been cut off from the love and support of their natural parents or, as is more likely, of others who might have adopted them. To protect children from the whims of those who, for several years, treated them as their own, courts have held that both "adoptive" parents must be estopped from denying their duty to support the child. Under any other result, the child would be irreparably harmed. *Accord In re Marriage of Valle,* 53 *Cal.App.*3d 837, 126 *Cal. Rptr.* 38 (Ct.App.1975) (husband estopped to deny duty to support nephew brought to the United States as infant and raised as his son); *Wener v. Wener,* 35 *A.D.*2d 50, 312 *N.Y.S.*2d 815 (App.Div.1970) (child brought from Florida raised as parties' daughter—husband who agreed to adopt her has duty to support under either implied contract or equitable estoppel theories). These cases are easily distinguishable from the present case since, of course, here there are two natural parents, at least one of whom is present and another, while absent, may still be available.

Courts also have relied on the doctrine of implied or express contract to hold that when the stepfather expressly promises to care for the children and the wife relies on this promise, the husband's promise and the wife's reliance thereon are sufficient consideration to create a continuing obligation to support the children after a divorce. *See L. v. L.,* 497 *S.W.*2d 840 (Mo.Ct. App.1973); *T. v. T.,* 216 *Va.* 867, 224 *S.E.*2d 148 (1976). No evidence was presented that Gladys married Jay on his repre-

sentation that he would support her daughters. Thus, Gladys did not rely on the theory of implied contract; she relied instead on the doctrine of equitable estoppel.

## IV

■ Today, we decide that in appropriate cases, a permanent support obligation may be imposed on a stepparent on the basis of equitable estoppel, but that this doctrine should be applied with caution. Voluntary support by a stepparent should not be discouraged.

It is essential, however, that, in the interim period between the spouse's separation and the trial court's decision on permanent child support, the children have a source of support. We therefore find that if, in a motion for *pendente lite* child support, the natural parent demonstrates that he or she is not receiving support for the children from their other natural parent and establishes by affidavit that the stepparent's conduct actively interfered with the children's support by their natural parent, so that *pendente lite* support may not be obtained from the natural parent, the children should be awarded *pendente lite* support from the stepparent. By permitting a spouse to get interim support for the children, we alleviate any immediate hardship to the children caused by the breakup of a marriage in which a stepparent is the sole or major source of support for the family. Such interim support order should remain in force until circumstances justify a modification of the Order or the court makes its final determination.

■ To be entitled to permanent child support, Gladys, as the party alleging equitable estoppel, has the burden to prove that Jay's conduct established the three prerequisites to equitable estoppel—representation, reliance, and detriment. We recognize that there can be many forms of misrepresentation. We do not agree with those courts that have held that for equitable estoppel to apply the children must believe that the stepparent is their natural parent. Such a requirement would unduly limit

this cause of action to those cases in which the stepparent appeared on the scene when the children were infants. We do believe, however, that for equitable estoppel to apply the stepparent must have made some representation of support to either the children or the natural parent as to his or her responsibilities in his or her relationship with them.

■ With respect to the reliance element of equitable estoppel Gladys contends that Jay's actions induced the girls to rely on him emotionally and financially, while he deliberately alienated the children from their natural father's emotional and financial support. It is undisputed that Jay, while living with Gladys, developed a loving relationship with the girls, and that the girls relied on him for emotional support. However, no court has ever applied equitable estoppel to force a husband to support the children of his divorced spouse merely because he developed a close relationship with the children, nurtured them into a family unit with himself as the father, and had the children call him "daddy." We decline to be the first to set such a precedent.

We specifically determine that the development of "emotional bonding" as set forth by the trial court is not sufficient to invoke the doctrine of equitable estoppel in stepparent cases. To hold otherwise would create enormous policy difficulties. A stepparent who tried to create a warm family atmosphere with his or her stepchildren would be penalized by being forced to pay support for them in the event of a divorce. At the same time, a stepparent who refused to have anything to do with his or her stepchildren beyond supporting them would be rewarded by not having to pay support in the event of a divorce.

To prove equitable estoppel, the custodial parent has the burden to establish not only representation of support and reliance but also detriment, *i.e.*, that the children will suffer future financial detriment as a result of the stepparent's representation or conduct that caused the children to be cut off from

their natural parent's financial support. Matrimonial cases are extremely fact-sensitive because each case involves a unique set of interpersonal relationships. The burden of establishing economic detriment depends on the facts of the particular case.

For example, at the final hearing if the custodial parent demonstrates that he or she (1) does not know the whereabouts of the natural parent; (2) cannot locate the other natural parent; or (3) cannot secure jurisdiction over the natural parent for valid legal reasons, and that the natural parent's unavailability is due to the actions of the stepparent, a trial court could hold that the stepparent is equitably estopped from denying his or her duty to support the children.

If, as in the present case, the wife knows where the natural father is, she has the burden to bring him before the court and to seek child support from him. Once in court the burden is on the natural father to show why he should not, in equity, be required to pay child support for his children. If the court finds that the natural father should not be required to pay child support due to the stepfather's conduct, the natural father having relied thereon and having placed himself in such a position that he is unable to meet that obligation, the stepparent should be responsible for the children's continued support. This, of course, is subject to modification or change whenever the natural father can meet his obligation. We have, in countless situations, recognized that changed circumstances should be reflected in changed obligations regardless of earlier commitments.

We emphasize, however, that the natural parent should always be considered the primary recourse for child support because society and its current laws assume that the natural parent will support his or her child. It is only when a stepparent by his or her conduct actively interferes with the children's support from their natural parent that he or she may be equitably estopped from denying his or her duty to support the children. Collection of child support from recalcitrant

spouses is a persistent problem throughout this country. *See* C. Jones, N. Gordon & I. Sawhill, Child Support Payments in the United States (Working Paper 992–03, The Urban Institute, Oct. 1976). If a stepparent marries a divorced parent who is not receiving any child support, or if during their marriage the natural parent stops paying child support without interference from the stepparent, the stepparent does not thereby inherit the permanent support obligations of the nonpaying natural parent. The stepparent must take positive action interfering with the natural parent's support obligation to be bound. Further, if the stepparent paid *pendente lite* or permanent support, he or she may have a claim for reimbursement against the natural parent.

In applying this rule to the present case, the trial court must decide whether the two girls, both of whom were in their late teens when this action arose, incurred any detriment as to their *future* support by their previous reliance on their stepfather for support. To decide that the girls have incurred such detriment, the court must find that Jay's conduct interfered with Ralph's present duty to support them.

In concluding this issue, we hold that in appropriate cases, the doctrine of equitable estoppel may be invoked to impose on a stepparent the duty to support a stepchild after a divorce from the child's natural parent. But we admonish that the doctrine be invoked cautiously. Here, Jay should be required to pay child support during the pendency of this litigation since Gladys has satisfied the requirements that we have set down for a motion for *pendente lite* child support. However, to obtain permanent support Gladys must prove at the trial that the facts support the application of the equitable estoppel doctrine. We therefore reverse the Appellate Division's judgment and remand to the trial court for a determination of the facts necessary to decide this issue in accordance with this opinion.

## V

The subordinate issue presented on this appeal is whether the trial court's award of sole possession of the marital home, minus the set-off of certain marital debts of Jay to Gladys, constituted an equitable distribution of the marital assets. Based on the facts of this case, we disagree with Jay's argument that this award was *per se* error by the trial court. However, equitable distribution is intimately tied to child support and alimony. *Smith v. Smith*, 72 *N.J.* 350, 359 (1977). Upon remand, the trial court should reconsider the entire financial arrangements between the parties, including the equitable distribution of marital assets.

HANDLER, J., concurring in part and dissenting in part.

Equity may insist that a stepfather accept a continuing obligation to support his minor stepchildren upon the termination by divorce of his marriage to their mother. I firmly believe that this is an appropriate case to recognize that defendant be required, under principles of equitable estoppel, to continue to provide child support for his minor stepchildren. In my opinion, the record discloses sufficient facts to call for the imposition of such an obligation. I would therefore affirm the judgment of the Appellate Division.

The Court today quite fittingly acknowledges that the interests of the parties in a matrimonial dispute can be resolved by the application of the doctrine of equitable estoppel. As noted by the majority, courts have invoked the principle of equitable estoppel to enforce a continuing duty of support of minor stepchildren. *Ante* at 163 (citing *A.S. v. B.S.*, 139 *N.J.Super.* 366 (Ch.Div.1976), aff'd, 150 *N.J.Super.* 122 (App.Div.1977), and *Ross v. Ross*, 126 *N.J.Super.* 394 (J. & D.R.Ct.1973), aff'd, 135 *N.J.Super.* 35 (App.Div.1975)). However, as the Court points out, the cited cases involved situations in which it was found that the stepfather expressly promised to care for the stepchildren and the wife relied on that promise, thus establishing

sufficient consideration to create a continuing obligation to support the children after a divorce.

We have in other contexts recognized the justness in imposing support obligations founded on a promise expressly made or reasonably implied from a course of conduct. *Crowe v. DeGioia*, 90 *N.J.* 126 (1982); *Kozlowski v. Kozlowski*, 80 *N.J.* 378 (1979). In this case, no evidence was presented that plaintiff married defendant on his promise or representation that he would support her daughters. In consequence, plaintiff's cause of action is not grounded on a theory of express or implied contract, but is appropriately based on the doctrine of equitable estoppel.

Equitable estoppel is a doctrine that is designed to bring an uniquely individualized controversy to a just and fair disposition, taking into account the special and particular relationship and course of dealing between the parties. The doctrine, well understood in its classic definition, requires of one party a representation, and of the other party expected, consequential, and detrimental reliance. *See Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 *N.J.* 334, 339 (1979); *Malaker Corp. Stockholders' Protective Comm'n v. First Jersey Nat'l Bank*, 163 *N.J.Super.* 463 (App.Div.1978), certif. denied, 79 *N.J.* 488 (1979). Equitable estoppel may be appropriate in any equitable cause of action or defense. In this case, its application is especially compelling because children are involved. Consequently, the doctrine, in this setting, requires a somewhat broader conceptualization.

In the matrimonial context, when the rights and interests of innocent children are at stake, we should consider in applying the doctrine of equitable estoppel whether there was a course of conduct that, in its cumulative impact, was tantamount to a representation made by one party with the expectation that other persons would rely on this conduct, and whether, as a natural and probable consequence, such persons did in fact reasonably rely, resulting in a detriment to them. That detri-

ment—the disadvantage or change of position—can occur because of the actor's subsequent repudiation of his or her conduct and disavowal of the expectations engendered by that conduct.

Equitable estoppel so understood should be available in matrimonial causes, especially when the best interests of minor children are implicated. In *Newburgh v. Arrigo*, 88 *N.J.* 529, 551 (1982), I stated in concurrence:

> These considerations impel me to urge that the controversy in this case be resolved by the application of equitable principles which focus solely and sharply upon the actual conduct of parties in resolving the merits of the central issue. The unerring focus of equity upon party conduct, I submit, is uniquely appropriate for the resolution of matrimonial disputes and especially conducive toward reaching the fair, sound, and right disposition—that elusive ultimate end that is often so difficult to identify and demonstrate in matrimonial causes.

In this case, the gravamen of plaintiff's complaint is, and the evidence presented shows, that by a pronounced and purposeful course of conduct, defendant induced his stepdaughters to rely on him as their father and as their sole source of paternal sustenance and support. Further, in so doing, he frustrated and cut off the girls' relationship with their natural father. There is little question that when defendant terminated his marriage and ended his familial relationship with his wife and his stepdaughters, he left the children at a substantial financial disadvantage. In effect, he repudiated his prior course of conduct and disavowed the expectations he himself created. I am satisfied that the record meets plaintiff's evidential burden to demonstrate that defendant equitably should be estopped from disclaiming a continuing duty to support these children.

The facts to this end are not disputed. Prior to her marriage to defendant, plaintiff was married to Ralph Febre. Shortly after the birth of their second child, plaintiff separated from and then divorced Ralph. Although there was no support provision in that divorce agreement, Ralph continued to support plaintiff and the children until he went to prison on a narcotics charge in 1968. Immediately prior to his going to prison, he gave plaintiff $5,000 for the support of his daughters. While in

prison and after his release, Ralph continued to express his interest in and concern for his children. After his release, he advised plaintiff that he wanted to resume providing financial support for his daughters. However, when he did send a check to the girls, defendant, since married to plaintiff, tore it up. Defendant himself testified that he refused Ralph's money because he was concerned that he and plaintiff would be associated with Ralph. Confronted with defendant's strong opposition, Ralph finally stopped attempting to send money to the children. Consequently, during his marriage to plaintiff, defendant not only supported the children, claiming them as dependents on his 1979 tax return, but also actively terminated any support from their natural father. As expressly found by the Appellate Division, and reiterated in the majority's opinion, *ante* at 161:

> [U]pon Ralph's release from jail he attempted to visit his children but defendant strenuously opposed any visitation and, in fact, prohibited it. He rejected all offers of Ralph to contribute to the support of his children and tore up a check tendered for that purpose. Ralph desisted from further attempts at visitation or payment of support.

The thrust of this matrimonial proceeding is *child support.* Thus, the critical focus should not be on whether defendant represented himself as the natural father of the children or whether the children came to love their stepfather as if he were their natural parent. Rather, the concern should be with whether, by word and deed, defendant affirmatively encouraged, and actually succeeded in attaining, the family's financial dependence upon him and, further, whether defendant deliberately and aggressively cut off the support that the children had been receiving or might have received from their natural father.

I agree with the Court that the love between defendant and the stepchildren is not the pivotal consideration. The gist of the equitable cause of action here is rooted in the fact that defendant affirmatively established himself as the sole or primary supporter of the family and zealously deprived his stepchildren of the support they were otherwise entitled to secure

from their natural father. Nevertheless, parental love may be a relevant factor to be weighed in making the equitable assessment. Thus, if this emotional bonding with the stepfather has contributed to or exacerbated the alienation of the children from their natural father and, as important, has served to discourage the natural father from maintaining a full parental relationship with his own children, it may have a material bearing on his failure to support his children.

Here, it is undisputed that throughout the seven years that plaintiff and defendant lived together, defendant developed a loving relationship with the two girls. The children came to refer to him as "daddy," and called his mother and father "grandma" and "grandpa." As the Appellate Division found:

[H]e was an affectionate father and took the girls everywhere. He held the girls out as his own children. He even became a Girl Scout Troop leader, so he could be with them. He enjoyed sports with them and they came to love defendant as a father.

At the trial both children testified separately *in camera* that they knew Ralph was their natural father, but they considered defendant their "father" and loved him very much. Further, although there were discussions between the Millers as to defendant's adoption of the girls, Ralph refused to consent to the adoption. Therefore, the girls' names could not be changed legally to Miller. Nevertheless, although it is disputed who initiated the change, it is uncontroverted that during the time the girls lived with defendant, they began using the surname Miller at school, and their school records were changed to reflect that their name was Miller. These factors underscore and buttress the salient circumstance that defendant succeeded in driving a deep wedge between his stepchildren and their natural father.

In applying equitable estoppel, it is important to consider the public policy consequences of the particular outcome. *Newburgh v. Arrigo, supra,* 88 *N.J.* at 551 (Handler, J., concurring). The majority suggests that the application of the doctrine in this case could serve to discourage loving relationships between

stepparents and stepchildren. *Ante* at 168–169. Not so. Involved in this case is not simply the loving and affectionate relationship that can arise in the new family groupings that emerge in successive marriages. Rather, it is the conduct of a stepfather who has aggressively alienated children from their natural father and vigorously discouraged any financial support from their father. No sound public policy should countenance, encourage, or reward such conduct.

In cases like this one, involving successive failed marriages, children are often left like the wounded on a matrimonial battlefield, that is alternately occupied and abandoned by adult combatants. The cement in the application of equitable estoppel in this situation is not parental love; it is parental responsibility. We deal not with familial love or even emotional nurture, but with parental obligation. Equitable estoppel is triggered by the fairness and justness of attaching accountability to one's actions. The imperative of the doctrine in this case is drawn from the indisputable fairness in preventing the defendant from denying that he has assumed a responsibility—of his own making—to continue to provide financial support for his minor stepchildren. In this case the application of the doctrine would promote the socially-desirable end of discouraging a stepparent from actively alienating his or her stepchildren from the support, as well as the affection, of their natural parent.

I would not in this case, or similar ones, involving dependent children, provide a different rule—a more stringent one in terms of whether the support application is for permanent support or for interim relief. *Compare ante* at 167. I also disagree with the Court's insistence on almost absolute conditions for affixing liability upon the stepparent. With respect to establishing the prerequisites to the equitable cause of action, all that should be required is a representation or a course of conduct that equates with a representation that generates intended and natural expectations. The detriment to the children arises from their reliance on that course of conduct, in the form of a loss of support from their natural father. The

substantial disadvantage to the children inheres in the fact that their natural father has long since been discouraged by their stepfather from giving them financial support, and, that now their stepfather himself refuses support. If, at the time of the demise of the second marriage, the natural father is hard to find, or unavailable or uncooperative or unamenable to legal process—if he has to be run down and sued to enforce his legal obligation—this burden constitutes a sufficient detriment. It is assuredly a probable consequence of the stepfather's own purposeful course of alienation and hostility toward the natural father during the marriage. I would therefore leave the evidential onus upon the stepfather to prove otherwise, at least in a case like this one.

I do not agree that principles of equitable estoppel are to be applied with particular caution in such cases. *Compare ante* at 166, 170. An analysis of the complicated factual patterns that emerge in the matrimonial context should be based strictly on the equities. That sharp focus will lend greater clarity, sureness, and a sense of justness to the result ultimately reached. *Newburgh v. Arrigo, supra,* 88 *N.J.* at 550 (Handler, J., concurring). The Court's cautionary caveat is unnecessary, as any party seeking to establish the elements of this equitable cause of action faces a difficult burden, and courts applying the doctrine can be expected to do so conscientiously and carefully.

In sum, I would find that when a stepparent walks away from his marital family, regardless of spousal fault, after a marriage characterized by a course of conduct on his part that has resulted in the cutting off of financial assistance from the natural parent, the stepparent should remain provisionally responsible for the family's continued support. The responsibility is provisional because, as a matrimonial obligation, it is of course subject to modification or change. Changed circumstances may always be addressed by changing obligations, regardless of how fair these were when first imposed. *See, e.g., Petersen v. Petersen,* 85 *N.J.* 638 (1981). The support obligation, equitably imposed on the stepfather in this case,

need not endure indefinitely and does not eliminate or supersede the natural father's legal obligation to support his own children. Therefore, either party should be required, or given the opportunity, to assert this obligation against the natural father. The trial court should be vested with the discretion to determine the circumstances under which it would be appropriate or necessary to shift the responsibility for child support to the natural father. However, unless and until the natural father can be brought back into the picture, equitable estoppel should prevent the stepfather from passing the buck—literally. In no event should the stepchildren be left holding an empty bag.

Justice CLIFFORD joins in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices SCHREIBER, POLLOCK, O'HERN and GARIBALDI—5.

*For affirmance*—Justices CLIFFORD and HANDLER—2.