HOPKINS, J.T.C.
Plaintiffs have appealed a final determination of the Director, Division of Taxation, asserting a deficiency in New Jersey *543 Gross Income Tax (GIT) for tax year 1984, in the amount of $5,706, inclusive of penalty and interest.
The basic issue is whether plaintiff-taxpayer, John C. Marrinan, was in the trade or business of being a securities trader. Predicated upon that determination is whether he is entitled to deduct expenses of operating as a trader in securities. An ancillary question is whether the actions he took in preparing and reporting his taxable income to the Internal Revenue Service and to the State of New Jersey were such that he should be estopped from claiming that he is self-employed.
Taxpayer filed a GIT return for 1984 wherein he reported net income from a securities business on the schedule C form attached to the return. A form W-2, which had been issued to him by Whitenack Associates, a name under which he did business, showed a salary paid to him of $48,640. It also showed federal and state withholding tax, as well as social security taxes, paid on that amount. However, on the 1984 GIT return, he explained in a note that the “salary from self-employment was not being reported as [salary] income and was not being deducted on the schedule C” in computing taxable income from the securities business. Upon audit, the Director increased taxable income by the $48,640 amount shown on the W-2 and disallowed all deductions claimed on the schedule C. The disallowance of all deductions included a deduction for security losses in the amount of $9,642. There was also an adjustment decreasing the medical expense deduction by $1,368 since the adjusted income no longer justified it. N.J.S.A. 54A:3-3. The adjustments increased taxable income by $148,-690 and resulted in the “salary income,” shown on the W-2, being taxed twice.
Taxpayer graduated with a B.S. degree in economics from Fordham University in 1959. He then worked for two years at the Wall Street Journal, where he sold financial advertising. After that, he was employed as a representative for Francis I. DuPont, a securities firm, and subsequent to that, with Alton, Clauss, Parker & Redpath, where he was the sales training *544 director. In the late 1960’s, he joined a firm called Jaffee & Company as a securities trader and organized a corporation, known as Aspen Securities, of which he was president until 1973. That corporation was disbanded in 1973 and he testified that he has been a private trader in the market from 1973 to the present. Taxpayer’s undisputed testimony was that he engaged in approximately 4,600 securities trades, having a total value of $97,000,000, during 1984. In so doing, he consummated 15 to 20 transactions a day, 90% of which were day-to-day trades. He testified that he would borrow approximately $200,-000 a day in order to effectuate the trades and that such amount would be outstanding during the 260 work days of the year.
During early 1984, taxpayer maintained an office for his trading activities in Jersey City, where he shared space. Later in 1984, he moved to an office in New York City. His office contained a Quotron terminal, desk, telephone in the name of John C. Marrinan, a NASDAQ terminal and direct telephone lines to Herzog, Heine, Geduld, a brokerage firm. At that time, he had one full-time employee and one part-time employee.
In his transactions, taxpayer used his own name as well as that of Whitenack Associates and Liberty Investors, both of which were registered trade names. He maintained clearing accounts for securities trading at the First Fidelity Bank and Herzog; Heine, Geduld, both in his personal name and his trade names. He had 71 brokerage accounts at 66 securities brokers. These were all cash accounts designated.“deliver vs. payment” and “receipt vs. payment.” All transactions went to the clearing agent through Depository Trust Company. The Depository Trust Company is a centralized system for electronically transferring securities among institutional investors without the need for physical delivery of the shares. Taxpayer and his trade names had account number 31017 assigned to them by the Depository Trust Company.
The reason for having more than one account at a brokerage firm and the use of trade names was to maintain contact with *545 business associates, who often changed firms, necessitating an additional account at the same firm; the variation in commissions paid by different brokers; the need to maintain contact with more than one broker since some had different skills or other favorable attributes for business purposes; and the need to spread his business around in order to obtain a greater allocation in the participation of new issues. Further, in dealing with block trading desks of brokerage firms, he found that they preferred to do business with institutions, rather than individuals, and so, his trade names were important.
The Depository Trust Company publishes a directory listing approximately 7,000 institutions. Taxpayer is listed in that directory as “John C. Marrinan, Inc.” The erroneous inclusion of “Inc.” was inadvertent and taxpayer testified that he has been unable to correct that or find out exactly how it occurred. There has never been such a corporation.
Taxpayer testified that his typical day begins at 8:50 a.m. and that by 9:10 a.m., his phones would be ringing. He will receive approximately 15 to 20 calls relaying the results of morning research meetings about certain securities. Execution houses would also call to give him “a look ... in the more active stocks.” By 9:25 a.m., one or two of these are selected and orders to buy are placed. During the day, he continues to receive telephone calls updating research reports, as well as calls from block trading desks of various securities firms. Block trading desks may place as many as 100 calls a day to him. At the end of the day, taxpayer tries to get out of positions he has taken during the day and, after the close of the trading day, all trades are written up and all necessary paperwork completed.
All purchase and sale decisions are made by taxpayer and he does not rely upon outside advisers. He does, however, receive recommendations during the day from many sources.
Trading records of the securities activities are kept by the taxpayer and his staff. In the course of the day they will prepare a trading sheet, a daily blotter of longs and shorts, *546 review “confirms” and “received over the computer” transactions, post money figures to the trading sheets and confirm with Depository Trust Company as to the accuracy of the transactions shown on the confirmations.
Financial records maintained by the taxpayer include a checking account for the business, payroll records and a ledger book. The checking account is maintained at the First Fidelity Bank, in Jersey City, in taxpayer’s sole name, and is used for business purposes, only.
His federal and state tax filing, in addition to form 1040 (personal income tax return), include 940 (employers annual federal unemployment tax return), 941 (quarterly return of withheld taxes) and New Jersey unemployment and insurance reports. Taxpayer testified that there are 30 to 40 other traders, similar to him, throughout the country. They provide a service to major firms who are interested in an instant answer to block or partial block offerings. They know they will get an answer to their proposals within several minutes. Further, there is a degree of confidentiality since a partial block transaction can be concluded off the floor of the New York Stock Exchange and run over the tape only after the sale of the full block has been consummated. The major firms also benefit since they are able to get better prices for their customers than by attempting to dispose of a large block in one sale.
New Jersey gross income is defined in N.J.S.A. 54A:5-1, in part, as follows:
a. Salaries, wages, tips, fees, commissions, bonuses, and other remuneration received for services rendered whether in cash or in property.
b. Net profits from business. The net income from the operation of a business, profession, or other activity, at the provision for all costs and expenses incurred in the conduct thereof, determined either on a cash or accrual basis in accordance with the method of accounting allowed for federal income tax purposes but without deduction of taxes based on income.
e. Interest, except interest referred to in Clause (1) or (2) of N.J.S.A. 54A:6-14, or interest on savings certificates issued pursuant to the provisions of Chapter 6 of this act.
*547 f. Dividends. “Dividends” means any distribution in cash or property made by a corporation, association or business trust (1) out of accumulated earnings and profits, or (2) out of earnings and profits of the year in which such dividend is paid.
The justification for the Director’s treatment of dividends and interest realized by the taxpayer depends on whether taxpayer was engaged in the operation of a business. If he is not, then the dividends and interest are taxable as unearned income and any expenses attributable to their realization would be disallowed.
The New Jersey GIT is a tax on gross income. As such, it specifically defines 14 categories of income. Some of those categories are taxed on a gross basis without regard to associated costs, i.e., salaries, interest and dividends. Other types are taxed on a net basis, i.e., after the deduction for associated costs, i.e., net profits from business; partnership income; net gains or income from disposition of property; net gains or net income from rents, royalties, patents or copyrights. Further, N.J.S.A. 54A:5-2 provides that losses which occur within one category of gross income may be offset only against the same category of gross income and not used as an offset in a separate category of gross income.
While there is no dispute that the income realized in the taxpayer’s activities had its source as dividends and interest, taxpayer’s position is that they were realized in the conduct of a securities trading business, pursuant to N.J.S.A. 54A:5-l(b). If so, they have lost their identity as being taxable as interest and dividends for GIT purposes and the net income is properly taxable as business income. See Smith v. Director, Div. of Taxation, 108 N.J. 19, 26, 27, 527 A.2d 843 (1987), where the Court stated: “We find, as did the courts below, that the Act ‘insofar as income derived from a business conducted in proprietorship or partnership form is concerned, imposes a tax on net income.’ ” As business income, the costs and expenses incurred would be deductible in computing the taxable income.
In opposition to the Director’s position that the activities of the taxpayer did not rise to the status of a business, taxpayer *548 has relied upon principles which have been set out in various federal and New Jersey tax cases dealing with the issue. It is noted that there are no federal or state regulations specifically defining a business. Rather, the standards have evolved from various court cases commencing with those concerning federal taxes.
One of the first cases involving the definition of business for tax purposes was Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1910), wherein the Court, in construing a corporation tax imposed by Congress in the Tariff Act of 1909, defined “business” as “a very comprehensive term and embraces everything about which a person can be employed.” It further quoted Bouvier’s Law Dictionary, in stating it to be, “[tjhat which occupies the time, attention and labor of men for the purpose of a livelihood or profit.” Id. at 273. Subsequently, in Snyder v. Commissioner, 295 U.S. 134, 55 S.Ct. 737, 79 L.Ed. 1351 (1935), a case involving the issue of whether a taxpayer was involved in the “business of trading on the stock exchange,” it was held that an investor, seeking merely to increase his holdings, was not engaged in a trade or business. The Supreme Court specifically referred to the trial court’s failure to find that there was any support for the allegation that the taxpayer’s market operations constituted a “business regularly carried on for profit.” The Court further stated that:
[Taxpayer], however, did not allege or attempt to prove that he had devoted the major part, or any substantial part, of his business day to his stock transactions. Nor were there any facts produced to show that he might properly be characterized as a ‘trader on an exchange, who makes a living in buying and selling securities.’ [295 U.S. at 139, 55 S.Ct. at 740]
Later, in Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940), the Court was faced with what were “ordinary and necessary” expenses of a taxpayer’s trade or business within the meaning of section 23(a) of the Revenue Act of 1928. The Court assumed that the activities of the taxpayer in conserving and enhancing his estate constituted a trade or business but, nevertheless, disallowed the claimed deductions because they were not “ordinary and necessary.” In a concurring opinion, Justice Frankfurter, took the position that whether the *549 taxpayer’s activities constitute a trade or business was “open for determination.” In so doing, he opined that:
... carrying on any trade or business, within the contemplation of Section 23(a), involves holding one’s self out to others as engaged in the selling of goods or services. [Id at 499, 60 S.Ct. at 369]
The next meaningful case was Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941), where the Court held that salaries and other expenses incurred in looking after one’s own investments were not deductible, under section 23(a) of the Revenue Act of 1932, as expenses paid or incurred in carrying on a trade or business. There, the taxpayer had extensive investments in real estate, bonds and stocks, and devoted a considerable portion of his time to the oversight of his interests. He also hired others to assist him in offices rented for that purpose. His financial affairs were conducted through his New York office pursuant to his personal, detailed instructions. His residence was in Paris, France, where he had a second office. By cable, telephone and mail, petitioner kept a careful watch over his securities. While he sought permanent investments, the changes, redemptions, maturities and accumulations caused limited shifting in his portfolio. These were made under his own orders. The offices kept records, received securities, interest and dividend checks, made deposits, forwarded weekly and annual reports, and generally took care of the investments as instructed by the owner. This method of handling his affairs had been employed for more than thirty years. In denying the petitioner’s claim, the Court stated:
To determine whether the activities of a taxpayer are “carrying on a business” requires an examination of the facts in each case. As the Circuit Court of Appeals observed, all expenses of every business transaction are not deductible. Only those are deductible which relate to carrying on a business. The Bureau of Internal Revenue has this duty of determining what is carrying on a business, subject to reexamination of the facts by the Board of Tax Appeals and ultimately to review on the law by the courts of which jurisdiction is conferred____ The petitioner merely kept records and collected interest and dividends from his securities, through managerial attention for his investments. [Id at 217-218, 61 S.Ct. at 477-478]
Finally, the Supreme Court, in the case of Commissioner v. Groetzinger, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987), reviewed the history of the judicial efforts to define what *550 constituted a trade or business for tax purposes. Other than pointing out that the statement in the concurring opinion in Deputy v. DuPont, supra, to the effect that it “involves holding oneself out to others as engaged in the selling of goods or services” was not an integral part of the definition, it iterated the Higgins test. In so doing, it held that a gambler could qualify as being in the gambling business. It stated:
If a taxpayer, as Groetzinger is stipulated to have done in 1978, devotes his full-time activity to gambling, and it is his intended livelihood source, it would seem that basic concepts of fairness (if there be much of that in income tax law) demand that his activity be regarded as a trade or business just as any other readily accepted activity, such as being a retail store proprietor or, to come closer categorically, as being a casino operator or as being an active trader on the exchanges. [480 U.S. at 33, 107 S.Ct. at 986]
Turning next to the interpretation of business, as defined for purposes of the New Jersey GIT, there are two relevant Tax Court cases. Those opinions closely followed the federal definition of business.
The case of Walsh v. Taxation Div. Director, 183 N.J.Super. 370, 4 N.J.Tax 107, 443 A.2d 1128 (1982), involved the question of whether an individual, who was a full-time employee of the New Jersey Air National Guard, was also in the business of purchasing and selling securities for his own personal benefit. The court found that the taxpayer purchased securities and financed 50% of the purchase price with loans. There was nothing to show the volume, nor the period of time during which the securities were held. As such, there was nothing to indicate that the taxpayer was doing anything other than investing. Our court applied the rationale of the Higgins’ line of cases in holding that management of one’s own investments is investing and not the operation of a trade, business, profession or other activity under the New Jersey GIT.
In Applestein v. Taxation Div. Director, 5 N.J.Tax 73 (Tax Ct.1982), the taxpayer claimed that his security trading should be treated as a business. During the tax year 1977, he had a cash account, margin account and a bond account at a brokerage firm. He made 283 trades representing the purchase and sale of 279,409 shares with a total transactional value of *551 $5,473,082. These transactions ranged in amount from the purchase of 30,300 stock shares for $512,425 to the disposition of a bond for $112. As a result of the trading activities, he realized $18,155 in interest income and $65,376 in dividend income. He also had total capital gains of $212,738 and total capital losses of $30,043. Taxpayer incurred interest charges on his margin account and on loans from his father which were obtained to comply with the requirements of his margin account. The interest payments were disallowed as deductions by the Director.
While the above activity indicated a business, the facts further showed that the taxpayer was a full-time college student and that all the transactions were effected by his father, a certified public accountant. Taxpayer had never met with his broker and did not consider himself “financially astute.” Based on the failure of the taxpayer to have an “active role in the production of the profit” from the securities transactions, it was held that the profits were not from his business. In reaching that decision, the court recognized the Higgins principle:
The Higgins rationale has been employed extensively to determine whether a taxpayer trading securities for his own account was actually “carrying on a business” or merely managing his own investments. [Citations omitted] In each of these cases a factual analysis of the taxpayer’s particular securities activity was made to determine if his activity constituted the carrying on of a business. Factors such as the frequency, extent and regularity of the taxpayer’s securities transactions, the amount of personal investigation of his assets and his intent to gain income from relatively short term turnovers, have been employed by the federal courts to determine this issue. [Id. at 79]
New Jersey cases show that they rely upon and are in accord with the federal judicial definition of business. That definition, which was most recently iterated in Groetzinger, states that the issue is resolved by an examination of the facts of each case.
The record shows that the subject taxpayer worked full-time in trading securities on a short-term basis and that such securities trading involved transactions on a day-to-day basis which differed materially from actions of one preserving *552 or enhancing an estate. The facts that he had a separate office and was listed with numerous brokerage firms with whom he worked on a day-to-day basis, as well as the listing of his name in a directory listing approximately 7,000 institutions which buy and sell securities, show that his securities transactions were pursued as a full-time activity, in good faith, and with regularity, for the production of income for a livelihood, and not as a mere hobby. Constant and large scale effort was made by him. Skill was required and applied. He did what he did for a livelihood. Based upon the above, I find that the activities of taxpayer constitute a business within the provisions of N.J.S.A. 54A:5-1(b).
Director next contends that taxpayer is estopped from reporting his income as a self-employed securities trader since his manner of reporting his income as wages, as shown by a form W-2, and the withholding of his federal and state income taxes, as well as social security taxes from that salary, require him to report his income as salary, dividends and interest without any consequent deductions. It is noted that for the tax year 1984, as well as two prior years and a subsequent year, taxpayer followed a procedure whereby he paid himself a salary from which taxes were withheld and paid over to both the federal government and New Jersey and further, social security taxes were also withheld and paid over. However, when he filed his New Jersey income tax return, he specifically stated that the salary income was not being reported and it was also not being deducted in the computation of his business activities. This resulted in the net amount realized from the securities business, after costs and expenses, being reported as taxable income.
Director’s position is that the estoppel comes into play because this was part of a scheme to permit taxpayer to have full coverage of the Social Security Act even though he did not realize sufficient income to pay the full or maximum tax. It is further noted that the excessive salary income listed on the W-2, which amount exceeded the actual earnings from the *553 operation of the business, was used as a base for determining both IRA contributions and SEP [IRC section 401(c) pension plan] contributions. While the SEP contributions were deductible for federal tax purposes, they did not have any impact upon the New Jersey taxable income except to the extent that such excess payments would be held for the benefit of the taxpayer without the subsequent accretions being taxable income until they were withdrawn.
It should first be realized that the Director does not stand in the shoes of the Internal Revenue Service or the Social Security Administration. While much was stated as to the benefits which would be available to the taxpayer under the Social Security Administration Act, the fact does remain that instead of paying self-employment taxes of $2,986.70 on the $26,431 of taxable income from the securities business, he paid the maximum social security tax applicable to both the employee and employer portions on $37,800, or a total of $5,178.60. Thus, he paid excess social security taxes in the amount of $2,191.90. The fact that the employer’s portion of the social security tax, or $2646, was deducted by the taxpayer in reporting his taxable income for New Jersey GIT purposes, resulted in an understatement of New Jersey GIT by $66.15.
Director’s analysis of the excess SEP contributions deducted for federal tax purposes indicates that such excess amounted to $3,650 for 1983 and $2,275 in 1984. The only unreported New Jersey GIT 1984 income that could be ascertained from the above would be the 1984 taxable income realized on the excess contributions from earlier years. Such amount was not computed by the Director.
In support of the estoppel position, Director cites the case of U.S. v. Matheson, 532 F.2d 809 (2 Cir., 1976), for the proposition that a taxpayer must accept the consequences for failure to act in a consistent manner. In that case, the issue before the court was whether an individual who obtained Mexican citizenship upon marrying a Mexican national, effectively gave up her American citizenship when she signed a renunciation of:
*554 All protection foreign to said laws and authorities [of Mexico] and any right which treaties or international law grant to foreigners, expressly furthermore agreeing not to invoke with respect to the Government of the Republic [of Mexico] any right inherent in my nationality of origin, [at 811]
Based upon that renunciation, her estate was taking the position that she was not subject to United States estate tax laws as a citizen of the United States. The court did not interpret the document to be a renunciation of the United States citizenship but as an acceptance of the obligations of being a dual citizen of Mexico and the United States. That is entirely different from the position espoused by the Director herein. Here, the Director would impose upon the taxpayer a tax liability that would be inconsistent with the laws of the State of New Jersey merely because the taxpayer had characterized himself, on a W-2 form, as his own employer and had income taxes and social security taxes withheld from a drawing account which was being treated as salary. Recognizing that such was improper, the facts still show that he brought this fully to the attention of Director when his 1984 New Jersey GIT return was filed.
Director’s reliance upon Miller v. Miller, 97 N.J. 154, 478 A.2d 351 (1984), for the proposition that taxpayer is equitably estopped from claiming he was other than an employee is equally without merit. That court specifically held that equitable estoppel requires that the claiming party show that the alleged conduct was done intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on and the relying party must act so as to change his position to his detriment. Here, the Director has been unable to show that the taxpayer’s treatment of himself as his own employee and the consequent use of a W-2 to show withholding of taxes and social security was done with intent to achieve those benefits which Director has alleged. Further, there is no showing that the Director relied on the unorthodox practice to his detriment. In view of the relatively nominal understatement of New Jersey GIT attributable to the procedure followed by the taxpayer, as well as the statement on the New Jersey GIT return which *555 explained what had been done, it would be difficult to conclude that the taxpayer’s actions were intended to induce an understatement of New Jersey GIT. Rather, as stated in Miller v. Miller, supra:
[E]quitable estoppel is a doctrine that is designed to bring a uniquely-individualized controversy to a just and fair disposition, taking into account the special and particular relationship and course of dealing between the parties. [97 N.J. 154, 172, 478 A.2d 351 (1984) (Handler, J., concurring and dissenting in part) ]
The application of equitable estoppel to require the taxpayer to report income on an inappropriate basis in order to increase his New Jersey GIT liability is not an equitable act. The Legislature has provided for civil penalties where there are deficiencies in GIT due to fraud or negligence. N.J.S.A. 54A:9-6. The present determination of the Director includes a 5% penalty. While not so designated, it was obviously a negligence penalty.
The limited GIT advantages to the taxpayer’s utilization of a salary and the withholding of taxes, including F.I.C.A. taxes, as well as the potential for deferral of some GIT on the accretion of the SEP deposits, cannot justify a requirement that the taxpayer report business income in a manner contrary to law.
The parties will submit an agreed form of judgment, pursuant to R. 8:9-3, reflecting the 1984 GIT liability on the basis that taxpayer was engaged in the trade or business of securities trading.