Henrietta DEWS, Appellant,

v.

Milton DEWS, Appellee.

Milton DEWS, Appellant,

v.

Henrietta DEWS, Appellee.

Nos. 90–FM–1494, 90–FM–1599.

District of Columbia Court of Appeals.

Argued Dec. 1, 1992.

Decided Nov. 4, 1993.

Raymond M. Hertz, for Henrietta Dews.

Reginia L. Jackson, for Milton Dews.

Before FERREN, TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

These cross-appeals arise out of a divorce proceeding involving Henrietta and Milton Dews. We must decide, first, whether the trial court abused its discretion in its division of the marital property, and second, whether the trial court erred in applying the doctrine of equitable estoppel to prevent Mr. Dews from denying the legitimacy of a child born during the marriage, even though the evidence clearly shows that he is not the child's father. On both points we hold in Mr. Dews' favor.

Milton Dews filed a complaint against his wife, Henrietta Dews, seeking a decree of absolute divorce. Following a trial at which Mr. and Mrs. Dews were the only witnesses, the court entered a judgment of absolute divorce on the ground that the parties had lived separate and apart without cohabitation for more than one year. *See* D.C.Code § 16–904(a)(2) (1989). With respect to marital property, particularly the family home, the court ruled that "the property will be distributed in a 50/50 fashion," with certain credits to both parties for expenditures they had made. As to J., the child born during their marriage, the court awarded custody to Mrs. Dews and ordered Mr. Dews to make child support payments, despite the fact that Mr. Dews is, indisputably, not J.'s father. Applying the doctrine of equitable estoppel, the court ruled that Mr. Dews cannot deny the legitimacy of the child or his obligation to provide child support.

██ Both husband and wife appeal from the judgment. Mrs. Dews argues that the presumption in favor of "equal ownership" was rebutted and that the trial court did not properly apportion and distribute the marital home and other marital property. She also contends that the court failed to make adequate factual findings to support its legal conclusions.[1] Mr. Dews asserts that the trial court properly exercised its discretion in distributing the marital property but erred in its application of the doctrine of equitable estoppel. He argues that with respect to J. he was merely acting *in loco parentis,* and that once the divorce was granted, any obligation he may have had to support J. came to an end. We are satisfied that the trial court made adequate findings and conclusions and did not abuse its discretion in the distribution of the marital property. We also conclude, however, that the court improperly relied on equitable estoppel in imposing a duty of support on Mr. Dews, and thus we reverse that portion of the judgment which requires Mr. Dews to pay child support.

## I. THE EVIDENCE AT TRIAL

Milton and Henrietta Dews were married on August 21, 1971. They separated in January 1987, and from that time until the trial began in September 1990, they remained continuously separated without interruption and without any hope of reconciliation. No children were born of the marriage; however, during the marriage Mrs. Dews became pregnant through an adulterous relationship and gave birth to J. on April 23, 1980.

The court heard testimony relating to several items of property owned by the couple,

---

1. Additionally, Mrs. Dews claims that she is entitled to a reversal because she received ineffective assistance of counsel. The right to the effective assistance of counsel is derived from the Sixth Amendment to the Constitution, but that amendment is applicable only to criminal prosecutions. *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). In fact, the Supreme Court has held that the Constitution does not require the appointment of counsel, for example, to indigent parents in parental termination proceedings. *See Lassiter v. Department of Social Services,* 452 U.S. 18, 24–32, 101 S.Ct. 2153, 2158–62, 68 L.Ed.2d 640 (1981).

The right to appointed counsel may exist when an indigent litigant may be deprived of his or her physical liberty, *id.* at 26–27, 101 S.Ct. at 2159–60, but that is not the situation in this case. Thus, without any constitutional right to counsel at all, Mrs. Dews cannot be heard to complain that the counsel she had was constitutionally ineffective. *See Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); *Wainwright v. Torna,* 455 U.S. 586, 587–588, 102 S.Ct. 1300, 1301–02, 71 L.Ed.2d 475 (1982); *Lee v. United States,* 597 A.2d 1333, 1334 (D.C.1991).

including a coin collection, a photograph collection, a Lincoln automobile, and the marital home on E Street, S.E. The evidence showed that Mr. and Mrs. Dews acquired the home from Mrs. Dews' father, to whom they agreed to pay $30,000. Although her father died before they could pay him the money, Mr. and Mrs. Dews took out a loan for the full amount and divided it equally among Mrs. Dews and her two sisters. Mrs. Dews' $10,000 share was put toward renovating the home. Mr. Dews testified that his parents also gave him $10,000 during this period, which he and his wife spent on renovations.

The marriage ended, according to Mr. Dews, because of his wife's persistent use of cocaine. After trying on several occasions to help his wife stop using drugs, Mr. Dews eventually gave up and moved out of the marital home. About two months later he became aware that the mortgage company had begun proceedings to foreclose on the home and managed to obtain a loan from his employer to pay the mortgage arrearages and halt the foreclosure. Mr. Dews also testified that when he eventually moved back into the house, he had to pay an unpaid electric bill in order to have the electricity turned on, as well as $2,141.23 to the District of Columbia for four years (1987 through 1990) of back taxes on the property. In addition, Mr. Dews said that he alone paid for a variety of necessary repairs to the house. Before the trial began, Mr. Dews had an appraisal performed on the house; the appraiser determined that it had a value of $101,000. On cross-examination Mr. Dews testified that for a period of nine months he rented out a portion of the house, for which he received approximately $350 per month.

Mrs. Dews testified that her father gave her and her husband the home, and that before her father's death he asked that they give $10,000 to each of Mrs. Dews' sisters. Mrs. Dews also acknowledged that she "went outside of the marriage" and conceived a child which both Mr. and Mrs. Dews wanted, but could not conceive between themselves.

At first Mrs. Dews insisted that the child was conceived with her husband's knowledge and consent. On cross-examination, however, she admitted that she had initially told her husband that she became pregnant through artificial insemination, even though her pregnancy was actually the result of an adulterous affair. In response to several questions from the court, Mrs. Dews testified that Mr. Dews had a good relationship with the child, that the child called Mr. Dews "Daddy," and that the child had developed relationships with Mr. Dews' family. She also stated that the child is unaware that Mr. Dews is not his biological father.[2]

## II. THE TRIAL COURT'S FINDINGS AND CONCLUSIONS

The court found that Mr. and Mrs. Dews left their home in Maryland and moved into the District of Columbia in approximately 1980. The house into which they moved had been owned by Mrs. Dews' ailing father, but before they moved in, the home was given to them. Mr. and Mrs. Dews both cared for Mrs. Dews' father until his death. The deed to the home bears the names of both Mr. and Mrs. Dews, and the court found that it was a marital asset. Since the parties separated, Mr. Dews has paid the mortgage and the taxes and made all necessary repairs to the home.

The court said that there was "an assumption ... based on the statute, that the property will be distributed in a 50/50 fashion" and that it saw "no reason to depart from that assumption in this case." It rejected Mrs. Dews' argument that she should get "some additional credit because the home came from her father," noting that it was Mrs. Dews "who had left the marriage" and that "one substantial factor" in the breakup of the marriage was her use of illicit drugs. The court then proceeded to credit each party for expenditures made following the separation, awarded the coin collection to Mr. Dews, and directed the parties to decide

---

2. On rebuttal, Mr. Dews testified that he allowed his name to be put on J.'s birth certificate in 1980 because he was "tricked" into believing that his wife had been artificially inseminated. He stated that he did not become aware that his wife had misled him about the artificial insemination until 1988, when they went to a marriage counselor. He said he had never told J. that he was not J.'s actual father because he did not want to hurt the child.

between themselves how to divide the photograph collection.

As to the child, J., the court made several observations. The court found that Mrs. Dews had become pregnant with J. as the result of an extramarital relationship and that Mr. Dews was not his biological father, although Mr. Dews initially was led to believe that his wife had been impregnated by artificial insemination.[3] After he learned that his wife was pregnant, Mr. Dews affirmatively participated in all the preparations for the birth of the child and became an active and supportive parent after J.'s birth. Mr. Dews, the court said, "was a father to [J.] in material ways, in psychological ways, and in emotional ways.... By his own testimony, he has taken [J.] out hunting and fishing, and they have engaged in many activities that children engage in with their parents." Even after the separation, Mr. Dews had chosen "to play an active role in [J.'s] life," visiting with him virtually every weekend and occasionally during the week as well. The court noted that J. does not know that Mr. Dews is not his biological father. The court concluded, therefore, that the doctrine of equitable estoppel was applicable to the case and that, under the doctrine, Mr. Dews "cannot ... deny the legitimacy of [J.] and cannot deny his obligation to provide child support for [J.]" The court then determined the amount of support that Mr. Dews must provide[4] and ordered that Mrs. Dews retain custody of J. and that Mr. Dews be permitted liberal visitation.

**3.** The court found that Mr. Dews had been intentionally misled as to the manner in which Mrs. Dews became pregnant.

**4.** This amount is not contested. Mr. Dews challenges only the imposition of a duty on him to pay it.

**5.** Under the statute, relevant factors include:

the duration of the marriage, any prior marriage of either party, the age, health, occupation, amount and sources of income, vocational skills, employability, assets, debts, and needs of each of the parties, provisions for the custody of minor children, whether the distribution is in lieu of or in addition to maintenance, and the opportunity of each for future acquisition

## III. The Wife's Contentions

In a long line of cases discussing D.C.Code § 16–910, this court has consistently applied the well-settled principle that the trial court has considerable discretion and broad authority in distributing marital property as part of a judgment of divorce. *See, e.g., Negretti v. Negretti,* 621 A.2d 388, 389 (D.C.1993); *Mosley v. Mosley,* 601 A.2d 599, 600–601 (D.C.1992); *Leftwich v. Leftwich,* 442 A.2d 139, 142 (D.C.1982); *Benvenuto v. Benvenuto,* 389 A.2d 795, 797 (D.C.1978). The trial court is charged by statute with distributing marital property "in a manner that is equitable, just and reasonable, after considering all relevant factors," D.C.Code § 16–910(b), and "so long as the trial court considers all relevant factors, its conclusions will not be disturbed on appeal." *Bowser v. Bowser,* 515 A.2d 1128, 1130 (D.C.1986) (citing cases). We have recognized on many occasions that the factors which may be considered "relevant" vary from case to case,[5] and thus on appeal we need only decide whether the trial court abused its discretion in its "assessment of the totality of circumstances" and its resultant order. *Id.; Mosley, supra,* 601 A.2d at 601; *see Murville, supra* note 5, 433 A.2d at 1110. If "the trial court's findings of fact, conclusions of law and judgment, taken together ... present an integrated, internally consistent and readily understood whole," its decision will not be disturbed on appeal. *Bowser, supra,* 515 A.2d at 1130. With this standard of review in mind, we turn to Mrs. Dews' claims of

of assets and income. The court shall also consider each party's contribution to the acquisition, preservation, appreciation, dissipation or depreciation in value of the assets subject to distribution under this subsection, and each party's contribution as a homemaker or to the family unit.

D.C.Code § 16–910(b); *see Mosley, supra,* 601 A.2d at 601 (statutory list of factors is not exclusive). Whether one party to the marriage has had an adulterous affair may also be relevant. *Murville v. Murville,* 433 A.2d 1106, 1109 (D.C. 1981); *see Mazique v. Mazique,* 123 U.S.App.D.C. 48, 51–52, 356 F.2d 801, 804–805 (failure to perform marriage vows or concomitant obligations to marital relationship is relevant), *cert. denied,* 384 U.S. 981, 86 S.Ct. 1882, 16 L.Ed.2d 691 (1966).

error.[6]

First, Mrs. Dews argues that because a portion of the mortgage on the E Street home was obtained for the purpose of giving $10,000 to each of her father's three daughters, including herself, the trial court erred in "failing to give her a credit of Ten Thousand Dollars in the acquisition of the E Street property." She asserts that it is "undisputed from the testimony that the property was a gift to [her] from her father with the proviso that upon his death she pay to her sisters the sum of Ten Thousand Dollars each." From this premise she concludes that $10,000 of the money that went into the house was "rightfully [her] sole property" and not marital property. The trial court rejected this argument, saying:

> What is clear from the record is that when Mrs. Dews' father turned over the house to Mr. and Mrs. Dews, it became a marital asset. Mr. and Mrs. Dews later took out a $40,000 loan. From that loan they paid $10,000 apiece to two of Mrs. Dews' sisters.
>
> The other $10,000 from the loan was used, along with proceeds from the sale of [their prior home] and some monies which Mr. Dews had received from his parents, all those monies were used for substantial renovations that were made and were necessary at [the E Street house].

On this claim Mrs. Dews had the burden of proof. "[T]he party who claims sole and separate ownership has the burden of establishing that it is the same property that he or she acquired before the marriage" or by gift, bequest, devise, or descent. *Jordan v. Jordan*, 616 A.2d 1238, 1239 (D.C.1992); *see* D.C.Code § 16–910(a) (1989). The trial court was in the best position to evaluate each witness' credibility, and we are satisfied that its findings adequately support its decision not to credit Mrs. Dews specifically with the $10,000. Moreover, this court has held that under the District of Columbia statutory

scheme "[t]here is no room ... for tracing funds." *Jordan, supra,* 616 A.2d at 1239 (citation omitted). Thus the court did not err in declining to do so.

Mrs. Dews argues next that the trial court failed to consider several of the factors listed in section 16–910(b) in distributing the marital property. For example, she maintains that the court did not take into account the duration of the marriage, her contribution as homemaker, and the "source of the Marital Home, namely, [Mrs. Dews'] father." These arguments are without merit. As we have said, the court is required by statute to consider only "relevant factors," and its disposition of marital assets must be based on an "assessment of the totality of the circumstances." *Bowser, supra,* 515 A.2d at 1130. Thus, if the trial court's findings and conclusions "present an integrated, internally consistent and readily understood whole," this court must affirm the judgment. *Id.*

Contrary to Mrs. Dews' assertions, it is apparent to us that the trial court considered all relevant factors, including the ones that Mrs. Dews says it did not consider. In its factual findings the court noted the time of the marriage, the period during which the parties lived together, the date when Mrs. Dews temporarily moved out of the home, the short period of reconciliation, and, finally, the point at which the parties ultimately separated and for all intents and purposes ended the marriage. In addition, the court specifically referred to Mrs. Dews' argument "that she should be given some additional credit because the house came from her father," but concluded that this fact was outweighed by others favoring Mr. Dews. It is also evident that the trial court considered Mrs. Dews' "contribution as a homemaker," one of the statutory factors. The court made clear its view that Mrs. Dews had made little or no positive contribution to the home or the marriage, at least in its later years: "it was [Mrs. Dews] who left the marriage, and the court does credit the testimony of Mr. Dews

---

6. Since Mrs. Dews does not specifically challenge the trial court's "assumption" that the marital property should be divided equally between husband and wife, we need not decide whether that assumption was correct. We note, however, that the statute governing the distribution of marital property, D.C.Code § 16–910(b), contains no such assumption. "No hard or fast rule or mathematical formula can be applied in adjudicating property rights. Each case must be decided on its own merits." *Mitchell v. Mitchell,* 194 A.2d 828, 830 (D.C.1963).

that at least one substantial factor having to do with the deterioration and ultimate break-up of the marriage was drug use on the part of [Mrs. Dews]." The court also found that since April 1986 Mr. Dews had made all necessary payments on the house, including the mortgage, taxes, and repairs. In fact, the evidence showed that in order to halt the foreclosure proceedings resulting from his wife's extended inattention to financial matters, Mr. Dews made substantial payments and obtained mortgage insurance, but had to obtain a loan from his employer to enable him to do so.[7]

Mrs. Dews asserts that the trial court "addressed a few factors," that the "distribution of their most valuable asset [the home] merited more discussion," and that the "trial court's conclusions are just beyond what this Court has seen as a bare legal conclusion lacking the support of underlying factual findings." To the extent that these arguments are distinct from her other claims, we reject them. As we have said, the court need only consider "relevant factors," and we are satisfied that it did so. Although we cannot define precisely the extent to which the trial court must state its findings, this court has held that the findings need only be "sufficient to allow meaningful appellate review." *Pimble v. Pimble*, 521 A.2d 1173, 1175 (D.C.1987). As long as the findings contain "sufficient detail to enable this court to be in a position to review the trial court's ruling for *errors of law and clear factual errors*," the record is adequate. *Williams v. Williams*, 554 A.2d 791, 793 (D.C.1989) (citations omitted; emphasis added). The trial judge's oral findings in this case extend over thirteen pages of transcript. They are meticulous and detailed and, as is obvious from what we have already said, have enabled us to conduct a meaningful review.

We will not "substitute our own interpretation of the evidence for that reached by the primary finder of fact." *Murville, supra,* 433 A.2d at 1109 (citation omitted). We find no error of law and no abuse of discretion, and hence no basis to reverse the trial court's distribution of the marital property.[8]

### IV. THE HUSBAND'S CONTENTIONS

The evidence showed that Mr. Dews was in fact not the father of J., that Mrs. Dews had become pregnant with J. through an extra-marital affair, that J. did not know that Mr. Dews was not his actual father, and that Mr. Dews had represented himself to J. (and all the world) as J.'s father. On these facts the trial court ruled that Mr. Dews was equitably estopped from "denying [J.'s] legitimacy" and that he was responsible for J.'s support. We agree with Mr. Dews that this ruling was error.

Although a number of courts "have addressed the applicability of equitable estoppel in the context of a child support proceeding . . . [i]n the majority of these cases, the courts have declined to apply the doctrine to estop the husband from denying paternity and an obligation to support the child." *Knill v. Knill*, 306 Md. 527, 547, 510 A.2d 546, 548 (1986) (citing cases). We recognize that "[t]he presumption of the legitimacy of a child born in wedlock has always been considered one of the strongest known to the law." *Peters v. District of Columbia,* 84 A.2d 115, 118 (D.C.1951). Indeed, the District of Columbia has a statute declaring that if a child is born during the marriage of a woman and a man, the man is presumed to be the father of the child. D.C.Code § 16–909(a)(1) (1989). But that presumption is rebuttable,[9] and in this case it was rebutted. Although J. was born during the marriage,

---

7. Mrs. Dews, on the other hand, evidently had no interest in the marital home. Included in the record is a note she wrote to her husband which said, "It gives me great pleasure to know they are foreclosing on our house."

8. We do not reach Mrs. Dews' argument, made for the first time on appeal, that the trial court failed to consider the favorable tax consequences that Mr. Dews received from the home. The record reveals no mention of this issue in any manner before the trial court, either orally or in writing. Consequently, "[r]egardless of the potential merit of the wife's claim, her failure to raise it below bars us from considering it here." *Weiner v. Weiner,* 605 A.2d 18, 21 (D.C.1992) (citing *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967)).

9. *S.A. v. M.A.,* 531 A.2d 1246, 1250 (D.C.1987); *see* D.C.Code § 16–909(b).

Mrs. Dews admitted that she engaged in sexual relations outside the marriage in order to conceive and that Mr. Dews was unable to father a child. *See Beckwith v. Beckwith,* 379 A.2d 955, 961 (D.C.1977) (mother's admission that son was fathered by another man, not her husband, is sufficient to support finding of adultery), *cert. denied,* 436 U.S. 907, 98 S.Ct. 2239, 56 L.Ed.2d 405 (1978). Thus Mr. Dews, who under the circumstances is only a stepfather to J., has no duty, at least not one imposed by law, to support J. *See Prager v. Smith,* 195 A.2d 257, 259 (D.C.1963) (second husband has no duty to support wife's child from previous marriage).

■ Many appellate courts, including this one, have considered whether the doctrine of equitable estoppel might be applied to prevent a supposed father from denying paternity, but none that we have found has affirmed a trial court decision to that effect. *See, e.g., Fuller v. Fuller,* 247 A.2d 767, 769 (D.C.1968) (declining to apply doctrine), *petition for review denied,* 135 U.S.App.D.C. 353, 418 F.2d 1189 (1969); *Clevenger v. Clevenger,* 189 Cal. App.2d 658, 669, 11 Cal.Rptr. 707, 714 (1961) (finding elements of estoppel absent); *Remkiewicz v. Remkiewicz,* 180 Conn. 114, 117, 429 A.2d 833, 836 (1980) (facts not sufficient to establish estoppel); *V.L.P. v. J.S.S.,* 407 A.2d 244, 249 (Del.Fam.Ct.1978) (same); *Knill v. Knill, supra,* 306 Md. at 550, 510 A.2d at 551 (declining to apply doctrine); *Miller v. Miller,* 97 N.J. 154, 166–70, 478 A.2d 351, 358–359 (1984) (reviewing trial court ruling and remanding for further findings); *see also S.A. v. M.A., supra* note 9, 531 A.2d at 1255 ("despite the potential applicability of estoppel . . . we do not rely on that doctrine"). We see no reason in this case either to raise the bar of estoppel against Mr. Dews.

The elements of equitable estoppel are set forth in *Parker v. Sager,* 85 U.S.App.D.C. 4, 8, 174 F.2d 657, 661 (1949):

"The essential elements of equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially." 19 AM.JUR. *Estoppel,* § 42. The propositions stated are so elementary that no further authority need be cited.

The first case in the District of Columbia to discuss the application of equitable estoppel in a child support dispute was *Fuller v. Fuller, supra.* In that case the husband sought a divorce, and although the wife did not contest the divorce, she sought support for a child born during the marriage but conceived with another man prior to the marriage. This court held that "[e]quitable estoppel to deny a duty to support can be invoked only upon a showing that there was an express or implied misrepresentation of fact inducing another to alter his position to his prejudice," and that the record failed to "disclose such elements of equitable estoppel as would justify a reversal" of the trial court. 247 A.2d at 769. We said that the husband's act of permitting the child to refer to him as "Daddy" would not suffice as an adequate "misrepresentation" and that there was no evidence demonstrating "prejudice" to the child. *Id.* We declared, further, that applying the doctrine of equitable estoppel to require the husband to pay support could not alter the fact that the child was not his:

In the absence of the marriage of [Mrs. Fuller] to the natural father and an acknowledgment of paternity by him, the child is now and always has been illegitimate, and the court is powerless to remedy that status by imposing upon [Mr. Fuller] the paternal duty of support.

*Id.* We held that while the natural father had a continuing duty to support the child,

the husband had no such duty.[10]

*Clevenger v. Clevenger, supra,* a California case antedating *Fuller* by a few years, appears to have been the first to discuss the application of equitable estoppel against a husband who was attempting to assert the illegitimacy of a child born to his wife in order to avoid being obliged to provide support. The wife in *Clevenger* admitted that her husband was not the natural father and that she became pregnant while he was away in the Army. The court held that estoppel did not apply because, "[a]lthough the findings of fact state that [the husband] accepted the child, publicly acknowledged and treated the child as his own," there was no evidence that the husband made any representation to the child, either directly or by implication, that he was the boy's father. 189 Cal.App.2d at 670, 11 Cal.Rptr. at 714. The court went on to say:

> If the facts should show, however, that the husband represented to the boy that he was his father, that the husband intended that his representation be accepted and acted upon by the child, that the child relied upon that representation and treated the husband as his father and gave his love and affection to him, that the child was ignorant of the true facts, we would have the foundation of the elements of estoppel.

*Id.* The court then embarked on an extended discussion of the facts of the case and the elements of estoppel, ruling ultimately in the husband's favor.

In *S.A. v. M.A., supra* note 9, a somewhat analogous case in this jurisdiction, the issue was whether the husband who sought to deny paternity (and the resulting obligation to pay support) could obtain an order requiring the child to submit to a blood test. This court held that more than a "mere suspicion" of non-paternity must be shown before a child born in wedlock would be required to submit to such a test. 531 A.2d at 1254. In holding that the husband had offered insufficient evidence to overcome the presumption

of legitimacy, we highlighted the following facts:

> [T]hroughout N.'s [the child's] first six years, appellant [the husband] consistently affirmed his parentage of N. and treated N. as his child: when N. was born, appellant added N. as a dependent covered by his health benefits; with appellant's knowledge and consent, appellant was named as N.'s father on N.'s birth certificate; ... in his dealings with N., appellant always referred to himself as "Daddy," and N. knew appellant, and appellant only, as "Daddy".... Thus, for over six years, and on numerous occasions in which appellant could presumably be prosecuted for fraud for providing false information, appellant represented his parentage of N.

*Id.* (citation omitted). In addition, the *S.A.* court said in dictum that the doctrine of equitable estoppel had "potential applicability ... to the facts of this case," but expressly refused to rely on that doctrine to support its ruling. *Id.* at 1255.

While in *S.A.* we said only that estoppel had the "potential" to apply, we are asked in this case to rule on the correctness of its actual application by the trial court. Considering the elements of equitable estoppel set forth in *Parker v. Sager, supra,* we conclude that application of the doctrine in the case at bar is particularly inappropriate, if for no other reason than the fact—found by the trial court—that Mr. Dews was deceived as to Mrs. Dews' method of conception. Because Mr. Dews was without "knowledge, actual or constructive, of the real facts," *Parker, supra,* 85 U.S.App.D.C. at 8, 174 F.2d at 661,[11] we hold that it would be plainly inequitable to apply the doctrine against him. *See Nolan v. Nolan,* 568 A.2d 479, 484 (D.C. 1990). Mr. Dews' ignorance of the true state of affairs, namely, that Mrs. Dews was not artificially inseminated but instead conceived through an adulterous affair, is determinative and requires us to reverse the child support order. *See Clevenger v. Clevenger, supra,*

---

**10.** We also held that "acknowledgment of paternity upon the birth certificate by one not the natural father is not evidence of an agreement to support the child." *Fuller, supra,* 247 A.2d at 769. Thus, in the case at bar, the fact that Mr.

Dews' name is on the birth certificate is not dispositive.

**11.** *See* 31 C.J.S. *Estoppel* § 67 (1964).

189 Cal.App.2d at 673, 11 Cal.Rptr. at 716 (when putative father was deceived into believing that the child was his, he was not estopped later from disclaiming fatherhood when the truth became known).

The manner of conception is significant for estoppel purposes. "To clarify the paternity of the child conceived through artificial insemination, thirty states have adopted laws, many based on the Uniform Parentage Act, which provide that the artificial insemination offspring is the legal child of both the sperm recipient and her consenting husband. Even in states without such statutes, courts have held that the consenting husband is the child's legal father." 2 CHILD CUSTODY & VISITATION LAW & PRACTICE § 11A.02[1] (McCahey ed. 1991). Thus, assuming that his consent is valid—*i.e.*, given with full knowledge of all the relevant facts—a husband even belatedly consenting to artificial insemination may well consider himself, and be considered by the courts, to have a duty to support that child. At the very least, he would most likely be estopped in many cases to deny that duty. But in the case of a child conceived in an extramarital relationship, which we have here, the natural father remains fully liable to support the child. *Fuller v. Fuller, supra*, 247 A.2d at 769. There is nothing in the record before us to suggest that such support is not available in this case. *See* D.C.Code § 16–916(c) (1989) (authorizing court to order "a father or mother" to support a minor child).[12]

There may well be circumstances in which it is appropriate to impose on a stepparent the obligation to support a stepchild by invoking the doctrine of equitable estoppel. There should, however, be no doubt about when that doctrine will be applied, for any uncertainty will ultimately discourage the voluntary support that is so often provided by stepparents. *See Miller v. Miller, supra*, 97 N.J. at 166, 478 A.2d at 358. In this case the facts compel us to refrain from imposing on Mr. Dews any duty of fatherhood by estoppel.

V.  CONCLUSION

We reverse that portion of the trial court's judgment which requires Mr. Dews to pay child support. In all other respects, and particularly in the distribution of the marital property, the judgment is affirmed.

*Affirmed in part and reversed in part.*

12. There is likewise no indication in the record that Mrs. Dews is unable to offer at least some support, and there are emergency assistance programs available if all else fails. We emphasize, however, that the availability or unavailability of other resources cannot affect the rights of Mr. Dews or of other husbands in his situation.