Gail BARNES, Appellant/Cross–
Appellee,

v.

Harvey L. SHERMAN, Appellee/Cross–
Appellant.

Nos. 98–FM–109, 98–FM–1531.

District of Columbia Court of Appeals.

Argued Nov. 19, 1999.
Decided Aug. 24, 2000.

Louis Rabil, Washington, DC, for appellant.

Norman L. Blumenfeld for appellee. Harvey L. Sherman, pro se, was on the brief.

Before STEADMAN and RUIZ, Associate Judges, and PRYOR, Senior Judge.

RUIZ, Associate Judge:

This is an appeal from a judgment of absolute divorce awarding equitable property distribution. The trial court awarded Gail Barnes the sum of $40,000, which the trial court determined was her equitable portion of the value of Automotive and Related Industries, Inc. ("AutoBody"), a business that Harvey Sherman began shortly after his separation from Barnes. AutoBody was similar to Service Stations and Related Industries, Inc. ("FuelLine"), a business which the parties jointly owned and operated during their marriage. Barnes agrees with the trial court that AutoBody is marital property, but appeals the amount of the equitable distribution award, arguing that the trial court erred in not crediting Barnes' opinion testimony documenting a substantially higher valuation of the business. Sherman cross-appeals, disagreeing with the trial court's determination that AutoBody is marital property, and, alternatively, arguing that the court's valuation of AutoBody was erroneous.[1] We affirm the trial court's determination that AutoBody was marital property; we reverse the trial court's valuation of AutoBody and remand for further consideration in accordance with this opinion.

## I. Factual Summary

Harvey Sherman and Gail Barnes, who were married in 1981, incorporated Fuel-

---

1. The trial court's order disposed of numerous claims concerning other marital assets, alimony, and attorney's fees. The only issue on appeal concerns the trial court's determination that AutoBody was marital property and its valuation of AutoBody.

Line in 1983 to publish a commercial trade newspaper for automotive-related industries. The newspaper's sole source of income came from advertisements prepared and placed by automobile dealers and parts manufacturers. Barnes served as President of FuelLine and was responsible for the layout of the newspaper and company administration. Sherman was Executive Vice–President and Director of Sales, primarily responsible for the sale of advertisements. The FuelLine newspaper generated significant revenues and expanded into other regions, providing substantial compensation and profits for Barnes and Sherman up to 1994. The parties' marital difficulties exacerbated a decline in the business and they separated on September 7, 1995; the divorce proceedings were marked by recriminations and reprisals, including claims of mismanagement, theft, fraud and assault.[2]

On May 2, 1996, Barnes filed a "Motion for Order Terminating the Marital Business" on the grounds that FuelLine was bankrupt and continued operation of the business would drain equity existing in the other marital properties. On May 7, 1996, the parties entered into an agreement to dissolve FuelLine, the provisions of which were stated on the record in open court. Pursuant to this agreement 1) the name and logo of FuelLine was to be awarded to the highest bidder; if neither party bid for the name and logo, neither party would be entitled to use it, 2) miscellaneous corporate property, such as art boards used in laying out the newspaper, and office furniture, was to be purchased by either party at fair market value or sold at auction, and 3) both parties were to receive the subscriber and customer lists of FuelLine. After the appointed receiver memorialized the agreement in writing, Barnes refused to sign the written agreement. The trial court subsequently granted Sherman's mo-

tion to enforce the oral agreement "as to the terms of the agreement which were stated on the record in open court on 5/7/96."

Sherman incorporated AutoBody in the first week of June 1996, funding the business with money received from his family. Sherman testified that his brother loaned $13,500 to AutoBody on June 23, 1996.[3] The trial court accepted Barnes' contention that, rather than a loan, this amount was a reimbursement of $14,000 in marital funds that Sherman testified he had previously given his brother and sister-in-law.[4] Sherman further testified that his mother loaned $10,000 to AutoBody in June 1996 and in March 1997 gave another $30,000 to Sherman, who then transferred one-half of his stock in AutoBody to his mother two days prior to the start of the trial in April 1997. The trial court found that the entire $40,000 provided by Sherman's mother in June 1996 and March 1997 was for the fifty-percent interest in AutoBody.

At trial, Barnes did not call an expert witness to testify to the value of FuelLine and AutoBody. Rather, she provided her own testimony on the issue. Based on her knowledge of FuelLine's operations and finances as owner and president, Barnes testified that in 1991 FuelLine had a fair market value of $6,000,000, which had declined to between $3,000,000 and $4,000,000 as of October 1, 1995, when the parties had just separated. Based on her valuation of FuelLine and review of documents subpoenaed from AutoBody, a similar enterprise, Barnes valued AutoBody at approximately $2,000,000. Barnes testified that her basis to form an opinion of the value of AutoBody was her "knowledge that it goes to the same industry ... that FuelLine went to," that she was "familiar with the newspaper," and that she was "familiar with the customers." Barnes

**2.** The trial court noted, "[n]either party comes to this court with clean hands."

**3.** The record is unclear whether the amount was $13,500 or $14,500.

**4.** Sherman admitted delivering two checks dated October 8, 1994, to Larry and Iris Sherman. Each check was written in the amount of $7,000.

testified that AutoBody had "the same [growth] potential that FuelLine had." Based on the three months of figures for AutoBody which she had in her possession (July, August, and September 1996), Barnes calculated a profit of "30 to $34,000 a month[,] that's around not quite $400,000 a year." From these figures, Barnes testified that AutoBody "could easily be valued between 1.75 and two million dollars if not more." Sherman testified, on the other hand, that AutoBody's *gross receivables* for July, August, and September 1996 were "roughly about $50,000" per month, had dropped to $38,000 per month by May 1997, and that AutoBody had a negative value.

The trial court credited neither Barnes' nor Sherman's valuation of AutoBody. Instead, the court found that AutoBody was worth $80,000, stating that "[i]n return for $40,000 from his mother, [Sherman] gave her a one-half interest in his business. Thus, by his own actions, [Sherman] has admitted that he believed AutoBody has a value of $80,000." The trial court deemed it equitable to award Barnes $40,000 of the "admitted" value of AutoBody.

## II. Standard of Review

▇▇▇ "[T]his court has consistently applied the well-settled principle that the trial court has considerable discretion and broad authority in distributing marital property as part of a judgment of divorce." *Dews v. Dews,* 632 A.2d 1160, 1164 (D.C. 1993); *see also Negretti v. Negretti,* 621 A.2d 388, 389 (D.C.1993); *Mosley v. Mosley,* 601 A.2d 599, 600–01 (D.C.1992); *Leftwich v. Leftwich,* 442 A.2d 139, 142 (D.C. 1982); *Benvenuto v. Benvenuto,* 389 A.2d 795, 797 (D.C.1978). The trial court is charged by statute with distributing marital property "in a manner that is equitable, just and reasonable, after considering all relevant factors," D.C.Code § 16–910(b) (1997), and "so long as the trial court

considers all relevant factors, its conclusions will not be disturbed on appeal." *Bowser v. Bowser,* 515 A.2d 1128, 1130 (D.C.1986). If "the trial court's findings of fact, conclusions of law and judgment, taken together ... present an integrated, internally consistent and readily understood whole," its decision will be allowed to stand on appeal. *Bowser,* 515 A.2d at 1130; *see also Dews,* 632 A.2d at 1164.

## III. Equitable Distribution of AutoBody

### A. Whether AutoBody is Marital Property

Sherman's cross-appeal asserts that the trial court erred in finding that AutoBody, formed after he separated from Barnes, was marital property subject to equitable distribution. Sherman argues that the trial court's determination that AutoBody was marital property is inconsistent with the terms of the in-court agreement concerning the wind-up of FuelLine reached by the parties on May 7, 1996. Under that agreement, each party was to receive FuelLine's list of subscribers and advertisers and each had the opportunity to bid on the FuelLine name and logo and purchase corporation property at fair market value. The intent of the agreement, Sherman contends, was to permit each party to begin a new, separate business.

The trial court found that AutoBody was marital property because 1) the funds used by Sherman to begin AutoBody were not his separate property; they were either marital funds reimbursed from his brother and sister-in-law ($14,000), see *supra* note 4, or received from his mother ($40,000) for an interest in the business, and 2) Sherman used the artboards and layout from FuelLine to create the first editions of AutoBody as virtual clones of the FuelLine magazine,[5] which prior to dissolution was undoubtedly marital property. Sher-

5. The trial court commented that "it is clear that, in many respects, AutoBody was a replica of FuelLine."

man disputes the trial court's finding that to the extent Barnes had "made contributions to FuelLine, and the extent to which these contributions permitted [Sherman] to establish AutoBody," the new venture was marital property subject to equitable distribution.

The party who claims sole and separate ownership has the burden of establishing that the property is his or her separate property. *See Jordan v. Jordan,* 616 A.2d 1238, 1239 (D.C.1992); *see also Hemily v. Hemily,* 403 A.2d 1139, 1141 (D.C.1979) (noting "threshold requirement" for property exempt from distribution "is that it be 'the sole and separate property' of one spouse"). The court assigns each party his or her separate property, *see* D.C.Code § 16–910(a), and then distributes "all other property accumulated during the marriage," *i.e.* marital property, § 16–910(b). The trial court found that funds Sherman received from his mother and brother to establish AutoBody constituted "all other property" within the meaning of § 16–910(b).[6] Because the money received from his brother mirrored the amount Sherman had previously given his brother and sister-in-law out of marital funds, the trial court found these funds merely to be a reimbursement of the marital funds and, therefore, not Sherman's "sole and separate property." *See Cox v. Cox,* 639 A.2d 97, 99 (D.C.1994) ("A spouse may not circumvent the equitable distribution of the marital estate by concealing marital assets or by manipulating title to them."). This finding is not clearly erroneous. According to the trial court, because the $40,000 given by Sherman's mother to AutoBody was consideration for a one-half interest in AutoBody, it did not qualify as Sherman's separate property by gift or otherwise under § 16–910(a). Although we question whether the evidence established that the $40,000 received by AutoBody from Sherman's mother was intended as an investment reflective of Auto-Body's value, see *infra* Part III. C., the trial court's finding that the funds received by AutoBody from Sherman's mother in exchange for stock was an investment in the company, and not simply a gift to Sherman, is not clearly erroneous.

Based on the trial court's finding that the $40,000 from Sherman's mother was an investment in AutoBody, we understand the trial court's reasoning as follows: Because marital funds (the loan to Sherman's brother) and assets (FuelLine's artboards) were used to start up AutoBody, the business was marital property. The $40,000 invested by Sherman's mother was in exchange for a half interest in the business. This established the value of the concern at $80,000, of which the court awarded Barnes $40,000. Although we agree with Sherman that the May 7, 1996, agreement permitted each party to begin a new business, because Sherman began his business, at least in part, with marital assets, we conclude that the trial court's finding that AutoBody was marital property is supported by the record and not clearly erroneous.[7] We now turn to the valuation of that property.

## B. Barnes' Testimony Regarding the Value of AutoBody

Barnes argues that the trial court's refusal to credit her valuation testimony "in effect" "disallowed" the testimony and that there was no requirement that she testify

---

6. Sherman does not address the trial court's finding that the money received from his family to begin AutoBody was marital property.

7. We note, of course, that there is no requirement under our statute that a party receive an equal distribution of a marital asset, only an equitable distribution, taking into account, *inter alia,* "each party's contribution to the acquisition, preservation, appreciation, dissipation or depreciation in value of the assets subject to distribution...." *Burwell v. Burwell,* 700 A.2d 219, 223 n. 6, 224 (D.C.1997) (quoting D.C.Code § 16–910(b)); *see also Darling v. Darling,* 444 A.2d 20, 24 (D.C.1982) (wife's substantial non-monetary contributions in performing tasks associated with her husband's business entitled her to an equitable interest in the business).

to the "underlying facts or data" because she was testifying as an expert. Barnes further argues that the trial court committed legal error by refusing to credit her valuation of AutoBody, finding it unreliable because it was "not based on any recognized valuation method."

Barnes testified that the net profit per month of AutoBody was $30,000 to $34,000 (approximately $400,000 per year), and that based on such net profit, the quality of the AutoBody newspaper, the loyalty of its customer base, and its anticipated revenue, the company had a total present value of $1.75 million to $2 million. Barnes' figures for AutoBody were culled from bank statements and cancelled checks for July, August, and September 1996. Barnes tallied the expenses of AutoBody using checks from Sherman's subpoenaed bank records; on the revenue side, she relied on invoices, and, where no invoice was produced, by counting the ads in the AutoBody newspaper and computing the amount of billables using the official Auto-Body rate card. Barnes turned her $400,000 annual projected net profit figures for AutoBody to a present value of the going concern of $1.75 to $2 million "based on the amount of sales and the percentage of net profit" recouped over a period of years.

Barnes argues that the trial court "disallowed" her testimony. We disagree. The trial court in fact overruled a motion to strike her testimony.[8] Barnes' valuation testimony was accepted into evidence by the trial court, which deemed it consistent with "well-settled precedent that an owner is competent to testify as to his opinion of the value of his or her own company." *See, e.g., Independence Fed. Sav. Bank v. Huntley,* 573 A.2d 787, 788 (D.C.) (per curiam), *cert. denied,* 498 U.S. 853, 111 S.Ct. 148, 112 L.Ed.2d 114 (1990); *Hartford Accident and Indem. Co. v. Dikomey Mfg. Jewelers, Inc.,* 409 A.2d 1076, 1079 (D.C.1979). *Cf.* BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY, § 7.05, at 513 (2d ed. 1994) ("The nonowning spouse may testify to the value of an asset if he or she has had some exposure to the asset during the marriage. Such testimony is similar to the testimony of the owning spouse . . . ." (footnote omitted)).

■ Rather than "disallow" Barnes' testimony, the trial court simply did not credit her valuation, stating that "the Court agrees with [Barnes] that she is qualified to assess the value of AutoBody, but does not credit the validity or the accuracy of her valuation method."[9] The trial court noted specifically that, in calculating net profit, Barnes failed to consider any salary for Sherman, did not factor in taxes, and did not account for the significant drop in accounts receivable after September 1996. The trial court also rejected Barnes' valuation because her "simplistic analysis does not comport with the requirements of the earnings or market value approach," noting that Barnes provided no objective basis on which she capitalized gross revenue as a multiple of two (or five times net earnings) to arrive at her valuation of AutoBody. *Cf.* TURNER, *supra,* § 7.08, at 542 (number by which earnings capitalized

---

8. Barnes' argument that the trial court refused her testimony for lack of a basis for her "expert" opinion is infirm. Barnes points the court to Rule 705 of the Federal Rules of Evidence which reads: "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." FED. R.EVID. 705. Barnes was neither proffered nor deemed qualified as an expert; Rule 705 does not apply to non-expert testimony.

9. Barnes argues that her valuation was based on the "payback period rule" method. The "payback period" method of evaluation generally is used to assess the acceptability of capital expenditure by determining the length of time it takes to recover the initial cost of a project without regard to the time value of money. *See* LAWRENCE J. GITMAN ET AL., MANAGERIAL FINANCE 531 (payback period represents "the amount of time . . . required to recover the initial investment . . . the length of time it takes for an investment to pay for itself"). The payback period calculation does not give a present value for a going concern. *See id.*

generally "determined by an expert accountant").[10] Given these deficiencies, the trial court, as the arbiter of the credibility of witnesses, could reasonably reject Barnes' nonexpert valuation. *See Hawkins v. United States*, 663 A.2d 1221, 1230 (D.C.1995) ("[W]hen it comes to assessing the credibility of witnesses, we are particularly deferential to trial courts."); *see also Preston v. Preston*, 767 S.W.2d 618, 620 (Mo.Ct.App.1989) ("The trial court is free to believe all, part or none of the testimony of a witness even if such testimony is uncontroverted."). Accordingly, the trial court did not abuse its discretion in refusing to credit Barnes' valuation testimony.

### C. Trial Court's Valuation of AutoBody

▪ "An equitable distribution requires the court to consider the current values of the marital property, such that upon distribution, each party's needs are adequately addressed." *McDiarmid v. McDiarmid*, 649 A.2d 810, 813 (D.C.1994). Here the trial court considered evidence of the value of AutoBody from three sources: Barnes' testimony that AutoBody was worth $1.75 to $2 million, Sherman's testimony that AutoBody had a negative value, and the transfer of a one-half interest in AutoBody to Sherman's mother for $40,000. Unable to credit either of the widely disparate valuations of AutoBody offered by Barnes and Sherman, the trial court instead awarded Barnes $40,000, based on what Sherman's mother paid for a fifty-percent interest in the company, delivered to her two days prior to commencement of the divorce trial. *See* TURNER, *supra*, § 7.04, at 510 ("In some cases, however, the court may have difficulty believing that either party's position is correct. Thus, the law permits the trial judge to make his or her own valuation."). Barnes argues that the transaction between Sherman and his mother was a sham and should not be used

as the basis for an equitable award of AutoBody. Sherman also argues that the trial court's valuation is flawed. Although both sides argue that the trial court's decision was arbitrary, we are not thus bound to reverse or remand. The scope of this court's review is circumscribed in cases tried by a trial court without a jury: "[w]hen the case was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1997).

We noted in *McDiarmid* that "there are a variety of acceptable methods of valuing the goodwill of a professional practice, and no single method is to be preferred as a matter of law." 649 A.2d at 815. Rather, "[t]he selection of a valuation method is within the discretion of the trial judge." *Id.* Similarly, a number of different methods are available for determining the fair market value of a close corporation, *see* TURNER, *supra*, § 7.04, at 509, though "some valuation methods may be more appropriate than others for a particular form of enterprise, or in valuing particular elements of the enterprise," Arnold H. Rutkin, *Valuation of a Closely Held Corporation, Small Business or Professional Practice, in* 2 VALUATION AND DISTRIBUTION OF MARITAL PROPERTY, § 22.08, at 22–103 (Matthew Bender 1996). Nevertheless, we will "permit the trial court[ ] to accept any reasonable method which is supported by the evidence." TURNER, *supra*, 7.04, at 509; *see also De Liedekerke v. De Liedekerke*, 635 A.2d 339, 341 (D.C.1993) ("In a divorce proceeding the trial court has discretion over the method by which the division of property will be effectuated.").

▪ Although we "recognize that in a matter such as this exactitude is not possible," *Rogers v. Rogers*, 296 N.W.2d

---

10. The trial court noted that "no evidence was introduced to demonstrate the appropriate capitalization of average earnings or the applicable interest rates and relative risks involved in this type of business." In addition to those factors identified by the trial court,

we note that Barnes failed to consider the value of AutoBody's goodwill, if any, apparently failed to account for uncollectible debts, and failed to consider the loss of value attendant to her skills and expertise not being available to the AutoBody enterprise.

849, 853 (Minn.1980) (en banc), and notwithstanding the trial court's considerable discretion in choosing a valuation method, the method it chooses must allow the trial court to arrive at a distribution of marital property that, based on the evidence, is "equitable, just and reasonable." D.C.Code § 16–910(b). The trial court must engage in a "conscientious weighing of all relevant factors, statutory or otherwise, before reaching a conclusion about the proper distribution of the property," *Burwell v. Burwell*, 700 A.2d 219, 225 (D.C.1997) (per curiam), "but not limited to those [factors] enumerated in that section." *Bernard v. Bernard*, 730 A.2d 663, 665 (1999) (internal quotation omitted). "Relevance ... is a function of the particular evidence before the trial court and the issues arising therefrom." *Id.* (internal quotation and alteration omitted); *see also Bowser*, 515 A.2d at 1130 (the relevant factors will "vary in each case").

▉ In this case the trial court did not consider all relevant factors in coming to its valuation of AutoBody. The trial court's method of determining Barnes' equitable portion of the business was to award Barnes one-half of $80,000, Sherman having "admitted," contrary to his testimony that AutoBody had negative value, that one-half the business was worth $40,000 by giving his mother a fifty-percent interest in AutoBody for that amount. "Where the owning spouse himself or herself has valued the business in an *arm's-length transaction* with a third party, that valuation will be highly persuasive." TURNER, *supra*, § 7.08, at 541 (emphasis added);

*cf. Square 345 Associates Ltd. Partnership v. District of Columbia*, 721 A.2d 963, 973 (D.C.1998) (the authorities uniformly agree that "[a]s a matter of simple common sense, a recent arm's length sale ... is extremely probative evidence of fair market value") (quotation omitted). Although the trial court's determination was based on record facts, the trial court made no finding that the $80,000 valuation reasonably reflected an accurate market value of AutoBody as can be assumed when the value is set in an arm's-length transaction.[11] Given the timing of the transmittal of the fifty-percent interest two days before trial, and that the transaction on which the trial court's valuation was based was consummated between a mother and son, where considerations other than objective valuation may prevail, absent a trial court finding to the contrary, the record does not support that $80,000 represents a fair valuation.[12] Because "the trial court fail[ed] to consider all the relevant factors, we cannot determine whether the court properly exercised its discretion and achieved an equitable result." *Burwell*, 700 A.2d at 223.[13]

We reverse the trial court's order insofar as it concerns the amount of the equitable award resulting from Barnes' marital interest in AutoBody and remand for further proceedings consistent with this opinion.

*So ordered.*

---

11. On remand the trial court should consider Sherman's argument that, even if the stock transfer to his mother is an appropriate measure of AutoBody's value, the company should be valued at $60,000, as $10,000 was a loan to AutoBody.

12. Our concern that the trial court did not consider all relevant factors is further validated by Sherman's statement in his brief on appeal that "[i]t was not a long arm transaction [sic] based on what a willing buyer and a willing seller thought the company was worth," and the representation of his counsel

at oral argument on appeal that the amount of Sherman's mother's investment in AutoBody was motivated by concerns that bore no reflection on the value of the company.

13. On remand, if the trial court finds that the transaction between Sherman and his mother does not reflect a reasonably accurate value of AutoBody, it may be necessary to receive more evidence in order to make an accurate valuation, see *supra* note 10, before deciding Barnes' fair share of that valuation, see *supra* note 7.