The PEOPLE of the State of Colorado, Petitioner,

In the Interest of B.S.M., a Child,

and

Gunnison County Department of Human Services, Appellee,

and

Concerning William Gray Shirer, Appellant.

No. 09CA1116.

Colorado Court of Appeals, Div. VI.

July 8, 2010.

David M. Baumgarten, County Attorney, Thomas A. Dill, Deputy County Attorney, Gunnison, Colorado, for Appellee.

Morris, Lee & Bayle, LLC, Bernadette R. Lee, New Orleans, Louisiana; Isaacson Rosenbaum, P.C., Edward T. Ramey, Denver, Colorado, for Appellant.

Opinion by Judge LOEB.

William Gray Shirer (stepfather) appeals from the district court's judgment against him for $40,738.24 in foster care fees incurred by Gunnison County Department of Human Services (DHS) on behalf of his former stepson (B.S.M.). We reverse.

## I. Background and Procedural History

Stepfather was married to B.S.M.'s mother (mother), but is not the biological father of B.S.M., nor did he ever adopt B.S.M. When their marriage was dissolved in Louisiana in 2005, stepfather and mother were granted joint custody of B.S.M. Thereafter, in the aftermath of Hurricane Katrina, stepfather moved to Colorado. Although mother and B.S.M. later moved to Colorado also, stepfather claims, and DHS does not dispute, that stepfather did not live with mother or exercise parenting time with B.S.M. after he moved to Colorado.

According to the district court register of actions, DHS instituted a dependency and neglect proceeding concerning B.S.M. in 2006, and placed him in foster care. B.S.M.'s biological father could not be located and was served by publication. In March 2007, B.S.M. was adjudicated dependent or neglected as to mother, stepfather, and his absent biological father, and his foster care placement was continued. Stepfather alleges, and DHS does not dispute, that during the pendency of the dependency and neglect proceeding, stepfather declined to take custody of B.S.M.

In July 2007, DHS filed a verified petition for support pursuant to section 19–1–115, C.R.S.2009, requesting that stepfather reimburse it for foster care fees incurred for B.S.M. since September 2006. Stepfather, who had moved back to Louisiana, responded by denying that he was a parent of B.S.M. or had any duty to support him. The district court held a hearing, after which the court ordered that stepfather, as joint custodian of B.S.M. at the time he was adjudicated dependent or neglected, was responsible for B.S.M.'s support and, accordingly, was obligated to reimburse DHS for the foster care fees. The court further ordered both stepfather and mother to provide financial information to DHS so that reimbursement responsibility could be allocated appropriately between them.

Seven months later, DHS moved for default judgment against stepfather, alleging that mother had reimbursed DHS for $1,250.09, stepfather had not provided financial information as ordered, $40,783.24 was still owing to DHS for B.S.M.'s care, and judgment should enter against stepfather for that amount. Stepfather objected, arguing again that he was not legally responsible to support B.S.M. The district court ordered stepfather to provide financial information to DHS and indicated that his continued refusal to do so would result in judgment against him for the full amount sought by DHS. The court subsequently entered judgment against stepfather in the amount of $40,738.24. Stepfather's appeal followed.

## II. Stepfather's Obligation to Reimburse DHS

Stepfather contends that the district court erred in requiring him, as B.S.M.'s former stepfather, to reimburse DHS for foster care fees expended on behalf of B.S.M. We agree.

We review de novo the legal issue of whether stepfather has an obligation to reimburse DHS. *See People in Interest of M.L.M.,* 104 P.3d 324, 325 (Colo.App.2004).

### A. Sections 19–1–115 and 14–7–102, C.R.S.2009

Section 19–1–115, under which DHS sought reimbursement, imposes an obligation on a "parent" to reimburse costs expended for residential placement of a child. *See* § 19–1–115(4)(d), C.R.S.2009; *see also M.S. v. People,* 812 P.2d 632, 635 (Colo.1991). "Parent," for purposes of section 19–1–115, means the child's natural parent or a parent by adoption. § 19–1–103(82)(a), C.R.S.2009. Section 26–5–102(1)(b), C.R.S.2009, further provides that foster care fees are considered child support obligations to be determined pursuant to section 14–10–115, C.R.S.2009. *See People in Interest of S.M.S.,* 907 P.2d 739, 740 (Colo.App.1995). Section 14–10–115 obligates either or both *parents* to support a child. *See* § 14–10–115(2)(a), C.R.S.2009; *see also In re Marriage of Bonifas,* 879 P.2d 478, 479 (Colo.App.1994) (recognizing that, without a legal parent-child relationship, there is no duty under the child support statutes to support a child).

Here, there is no dispute that stepfather is not the natural or adoptive parent of B.S.M. DHS argues, and the district court

concluded, however, that section 14–7–102 also applies and obligates stepfather to reimburse DHS. We disagree.

Section 14–7–102, which was enacted in 1905, involves the commitment of a child to a state institution or a private institution at state or county expense. *See also* § 14–7–101, C.R.S.2009. The statute provides that the county "at whose expense such child is kept shall be entitled to recover from *the parent, legal guardian, or other person responsible for the support of such child* such sum for the care, support, and maintenance of the child as may be reasonable therefor." § 14–7–102 (emphasis added). Contrary to DHS' contention in its answer brief, the statute does not expressly reference foster care expenses.

In *M.S.*, the supreme court considered whether a child's parents were obligated for the costs of their child's residential placement only up to their ability to pay, as provided in section 19–1–115, or for the total costs, as provided in section 14–7–102. *See M.S.*, 812 P.2d at 635–36. The supreme court, in attempting to reconcile sections 19–1–115 and 14–7–102, held that in a dependency and neglect action, the more recently enacted section 19–1–115, which specifically applies to such actions, controls over the earlier enacted general reimbursement provision of section 14–7–102. *See M.S.*, 812 P.2d at 637.

Here, consistent with *M.S.*, we conclude that in a dependency and neglect action, the more specific section 19–1–115 controls as to who has an obligation to pay placement costs for the dependent or neglected child, rather than section 14–7–102. Thus, we agree with stepfather that once B.S.M. was adjudicated dependent or neglected and placed pursuant to section 19–1–115, the responsibility to reimburse DHS for costs of residential care was governed by section 19–1–115(4)(d), and the trial court erred in relying on section 14–7–102 as a basis to impose responsibility on stepfather. Because section 19–1–115(4)(d) is not limited to foster care fees, but rather imposes responsibility more broadly for the costs of providing residential care for a dependent or neglected child, DHS's characterization at oral argument of its costs as fees for institutionalizing B.S.M., rather than as

foster care fees, does not compel a different result. *See M.S.*, 812 P.2d at 633 (applying section 19–1–115, instead of section 14–7–102, when imposing costs for placing a disabled child in a residential treatment facility); *see also* § 19–1–103 (51.3), C.R.S.2009 (defining "foster care" to include placement of a child in a "facility").

## B. The Louisiana Parental Responsibility Order

■ Relying on *In re Marriage of Rodrick*, 176 P.3d 806 (Colo.App.2007), DHS also argues that stepfather was obligated to support B.S.M., and therefore reimburse DHS, because he had been granted joint custody of B.S.M. in the Louisiana dissolution proceedings and had never taken action to modify that order. We reject that argument.

Preliminarily, because we conclude that stepfather is not responsible for DHS's costs incurred for B.S.M. regardless of the existence of the Louisiana order, we need not address stepfather's contention that the Uniform Child Custody Jurisdiction and Enforcement Act, sections 14–13–101 to –403, C.R.S.2009, prevented him from taking action to modify that order.

■ A child's legal custodian, who stands in loco parentis to the child, may elect to terminate that status at any time and has no legal obligation to continue supporting the child. *See People in Interest of P.D.*, 41 Colo.App. 109, 112–13, 580 P.2d 836, 837–38 (1978). In *P.D.*, the child's legal custodian, who was married to the child's aunt and was granted joint custody as the result of a dependency and neglect proceeding, argued that the trial court erred by refusing to allow him to terminate custody and by requiring him to pay child support. *See id.* at 110–11, 580 P.2d at 836–37. A division of this court agreed and held that the custodian could terminate custody at any time and had no obligation to continue supporting the child. *See id.* at 112–13, 580 P.2d at 837–38.

In *Rodrick*, another division of this court distinguished *P.D.* and imposed a duty of child support on non-parents. *See Rodrick*, 176 P.3d at 812–13. *Rodrick* involved a hus-

band and wife who were in the process of adopting a friend's child, whom they had cared for since birth pursuant to a joint parental responsibility order, when they separated and began dissolution proceedings as to their marriage. *See id.* at 809–10. Although the husband wanted parenting time with the child and acknowledged that he considered the child to be his son, he contended that he was not required to support the child financially under section 14–10–115 because he was not the child's natural or adoptive parent. *See Rodrick*, 176 P.3d at 810.

The joint parental responsibility order in *Rodrick* was specifically entered as a prelude to a custodial adoption and to allow the husband and wife to have legal custody of the child for at least one year, which was required for them to adopt the child. *See id.* at 811. Thus, the division in *Rodrick* found that case distinguishable from *P.D.*, where the custodian was seeking to terminate his relationship with the child. Accordingly, the division held that both the husband and wife had a post-dissolution obligation to continue supporting the child whom they had planned to adopt. *Id.* at 812–13.

Here, in contrast to *Rodrick*, there is no indication in the record that the Louisiana custody order was intended as a prelude to stepfather's adoption of B.S.M., and, in fact, DHS does not dispute that during the dependency and neglect proceedings, stepfather did not live with B.S.M. and declined to take physical custody of him. Further, unlike in *Rodrick*, where the prospective adoptive parents provided all financial support for the child, there is nothing in the record here indicating that the Louisiana custody order imposed any support obligation on stepfather or that stepfather voluntarily provided any financial support for the child post-dissolution. Accordingly, we conclude that *Rodrick* is distinguishable, and we decline to extend the holding in that case to impose a support obligation on a former stepparent under the circumstances present in this case.

Further, courts in other jurisdictions that have addressed issues similar to the one before us have consistently determined that, absent exceptional circumstances not present

here, a former stepparent does not have a duty to support a former stepchild after the dissolution of the marriage to the child's biological parent. *See Weinand v. Weinand,* 260 Neb. 146, 616 N.W.2d 1, 6–8 (2000) (collecting cases and holding that the trial court abused its discretion by imposing a support obligation on a former stepparent as a consequence of the stepparent's visitation with the children); *Miller v. Miller,* 97 N.J. 154, 478 A.2d 351, 357 (1984) (distinguishing the situation of prospective adoptive parents when, because of the planned adoption, the child has had no contact with either biological parent and cannot turn to them for support, from that of a former stepparent, who has no support obligation for a former stepchild).

These cases reason that imposing a post-dissolution child support obligation on a former stepparent who wants to maintain a relationship with a child would create the undesirable result of discouraging the stepparent from doing so. For example, in refusing to impose a support obligation based on a stepparent's emotional bond and desire to continue contact with a child, the Supreme Court of New Jersey stated:

> [T]o hold otherwise would create enormous policy difficulties. A stepparent who tried to create a warm family atmosphere with his or her stepchildren would be penalized by being forced to pay support for them in the event of a divorce. At the same time, a stepparent who refused to have anything to do with his or her stepchildren beyond supporting them would be rewarded by not having to pay support in the event of a divorce.

*Miller,* 478 A.2d at 358; *see also In re Marriage of Holcomb,* 471 N.W.2d 76, 79 (Iowa Ct.App.1991) ("To use the relationship to impose a support obligation would discourage stepparents from establishing close and loving relationships with stepchildren."). We find the reasoning of these cases persuasive and applicable here.

Although we recognize that, unlike the custodian in *P.D.,* stepfather here did not take formal action in Louisiana to terminate his parental responsibilities before the dependency and neglect action was instituted, we disagree with DHS's contention that his fail-

ure to do so obligates him to reimburse it for B.S.M.'s foster care fees, particularly in light of the undisputed fact that stepfather declined to take physical custody of B.S.M. when the dependency and neglect action was filed.

In sum, we conclude that the district court erred by imposing, either under applicable statutes or because of the Louisiana parental responsibility order, an obligation on stepfather to reimburse DHS for its costs incurred on behalf of B.S.M.

### III. Appellate Costs and Fees

 Stepfather requests an award of his costs and attorney fees incurred on appeal. Costs will be taxed in accordance with C.A.R. 39(a). However, because stepfather states no legal basis for recovery of attorney fees on appeal, we decline his request to award them here. *See* C.A.R. 39.5; *Reed Mill & Lumber Co. v. Jensen,* 165 P.3d 733, 740 (Colo.App.2006).

The judgment is reversed.

Judge GRAHAM and Judge MILLER concur.